RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 17a0022p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

KIRSTEN WILLIAMS,

        *Plaintiff-Appellant,*

*v.*

AT&T MOBILITY SERVICES LLC,

        *Defendant-Appellee.*

No. 16-6078

---

Appeal from the United States District Court for
the Western District of Tennessee at Memphis.
No. 2:15-cv-02150—S. Thomas Anderson, District Judge.

Decided and Filed:  January 27, 2017

Before: GILMAN, GRIFFIN, and STRANCH, Circuit Judges.

---

## COUNSEL

**ON BRIEF:**  Steve Wilson, THE STEVE WILSON FIRM, Memphis, Tenneseeee, Matt Gulotta, THE GULOTTA FIRM, Memphis, Tennessee, for Appellant.  Charles W. Hill, Meghan K. McMahon, GLANKLER BROWN, PLLC, Memphis, Tennessee, for Appellee.

---

## OPINION

---

RONALD LEE GILMAN, Circuit Judge.  Kirsten Williams was employed by AT&T Mobility Services LLC (AT&T) as a Customer Service Representative (CSR).  Williams suffered from depression and anxiety attacks, which caused her to be frequently absent from work.  AT&T terminated Williams in July 2014 for job abandonment and for violating the company's attendance policy.  Williams then filed a lawsuit under the Americans with

Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, in the United States District Court for the Western District of Tennessee. She asserted claims against AT&T for failure to provide her with a reasonable accommodation, failure to engage in the interactive process, disparate treatment, and retaliation.

AT&T moved for summary judgment, which the district court granted as to all of Williams's claims. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

### A.     Job duties and attendance requirements for Williams's CSR position

Williams was employed as a CSR with AT&T from 2006 until she was terminated in July 2014. She worked at AT&T's Memphis Call Center, where her job duties included answering incoming calls and assisting customers with technical-support and billing issues. To answer calls, Williams had to be physically present at her workstation and logged in to her computer.

CSRs work eight-hour shifts, which rotate every six months. During these shifts, CSRs are expected to remain at their workstations receiving calls, with the exception of breaks for lunch, two prescheduled 15-minute breaks per day, and unscheduled restroom breaks as needed. Although there is no requirement that a CSR field a certain number of calls per day, CSRs typically handle about 40 to 50 calls during each shift.

If a CSR is not logged in to her workstation, any calls that would have otherwise gone to her are rerouted to another CSR. Both Darcus Payne, the Area Manager of the Memphis Call Center, and Laura McArthur, an AT&T Attendance Manager, submitted declarations explaining the consequences of a CSR's unscheduled absences. Such consequences include potential increases in customer wait times and decreases in the quality and speed of customer service. Unscheduled absences can also cause increased workplace tensions and decreased morale among the CSRs.

For these reasons, AT&T requires regular attendance by its CSRs. AT&T has Attendance Guidelines, under which CSRs accrue "attendance points" for unscheduled late

arrivals to and absences from work. A CSR who accumulates eight or more attendance points is subject to being terminated. But leave under AT&T's short-term disability (STD) policy, the Family and Medical Leave Act (FMLA), or an approved job accommodation under the ADA does not result in the accrual of attendance points.

AT&T handles all FMLA leave requests internally. STD leave and job-accommodation requests, however, are processed by a third-party claims administrator, Sedgwick Claims Management Services. Sedgwick manages AT&T's Integrated Disability Service Center (IDSC). CSRs therefore interact with the IDSC when seeking STD leave or job accommodations. If an accommodation appears to be medically necessary, the IDSC relays the request to the employee's supervisors, who then confirm whether the request can be honored.

**B.     Williams's attendance problems and requests for leave**

Williams struggled with attendance throughout her employment with AT&T. From 2007 to 2014, she received written warnings every year about her accumulation of attendance points under the Attendance Guidelines. Williams was absent from work for most of 2013 due to her depression and anxiety attacks. Most notably, she did not work from January until July of that year, using a combination of STD leave and FMLA leave to cover this time period. She worked a few days in August 2013 before returning to STD leave in September, and she remained on such leave through all of October and for large parts of November and December.

Williams's absenteeism continued into 2014. She returned to work on January 20, 2014, after having been absent since December 3, 2013. Her supervisors discussed her poor attendance record with her in both January and February 2014, warning her that she had accumulated nearly enough points for termination. During these conversations, Williams acknowledged that she understood the attendance policy. Later in February 2014, Williams received a negative written evaluation of her 2013 performance, which stated that her attendance and punctuality "does not meet" expectations and that she needed to "mak[e] real efforts to improve her performance and attendance."

Williams failed to heed these warnings and continued to miss work. She worked only sporadically after March 11, 2014. After April 9, 2014, she ceased to work entirely and did not return at any point before her termination on July 3, 2014.

Williams requested a combination of FMLA leave, STD leave, and job accommodations in the form of leave to cover her absences after February 4, 2014. She was denied FMLA leave for all absences beginning in December 2013 because she failed to meet the threshold eligibility requirement of having worked 1,250 hours in the preceding year due to her numerous prior absences. Williams obtained STD leave for her absences from April 10 to April 27 (these and all dates hereinafter refer to 2014 unless otherwise noted).

For all dates after April 27, the IDSC initially denied STD leave on the ground that Williams had provided insufficient medical documentation. AT&T then sent Williams a return-to-work letter, informing her that she would be terminated if she did not either appear at work by May 12 or obtain approval for more leave. In response, Williams told AT&T Employee Relations Manager Priscilla Adams that she could not return during May, and that she would send additional medical information to the IDSC. After such information was submitted, the IDSC approved STD leave for absences from April 17 to May 27, but denied STD leave for absences from May 28 onward, again finding that Williams had provided insufficient medical documentation. AT&T sent Williams another return-to-work letter, this time setting a June 10 deadline.

Williams again failed to return to work. In response, her supervisors began the process of seeking approval to terminate her on the grounds that she had accrued more attendance points than the number allowed by AT&T's policy, that she had abandoned her job, and that she had failed to return to work as directed. Her supervisors were careful to wait to take any action until Williams had submitted all of her medical information and the IDSC had evaluated the claim. Shortly thereafter, Williams's treatment providers submitted additional medical information to the IDSC in support of her STD claim for absences after May 27. The claim was denied on the basis of insufficient medical information, but Williams's supervisors decided to "make one more attempt" to contact Williams and determine whether she intended to return to work.

AT&T therefore sent Williams still another return-to-work letter, requiring her to be present by June 30. Williams responded that she could not return to work on that date.

Following Williams's third failure to return to work, her supervisors began reconsidering termination. Williams was then in the process of appealing the IDSC's denial of STD leave for all absences after May 27. But Area Manager Payne confirmed that even if the appeal were successful, Williams would still have 16 attendance points—double the amount constituting a terminable offense. After making this calculation, AT&T terminated Williams on July 3.

**C.      Williams's requests for flexible scheduling and additional breaks as accommodations under the ADA**

Williams argues that she could have performed her job if she had been given two accommodations: a flexible start time and additional breaks throughout the day. She first requested these accommodations in February 2014 during a conversation with one of her supervisors, Monica Scruggs. Scruggs began with a discussion about attendance issues. In response, Williams informed Scruggs that she was suffering from depression and anxiety attacks, and mentioned that she needed "flexible scheduling and additional breaks" as possible accommodations.

Williams's next accommodation request went through the IDSC. In March 2014, the IDSC informed another of Williams's supervisors, Chinna Prude-Anderson, that Williams had requested "restrictions/accommodations" in the form of STD coverage for several absences in February and March, as well as "intermittent time off moving forward." Williams now asserts that she intended her request for "intermittent time off" to mean that she could start her shift 30 to 60 minutes later each day. There is no indication in the record, however, that Williams explained this to anyone at the IDSC or at AT&T. Williams told Prude-Anderson that she needed an accommodation, but did not specify the reason for it, and also stated that the reason for her delay in submitting medical information to the IDSC was that she was waiting on her medical provider. The IDSC eventually closed the March accommodation request because Williams failed to timely submit medical information.

After Williams had her first appointment with nurse-practitioner Laura Thompson in April 2014, Thompson submitted a report of the visit to the IDSC later that month. Thompson diagnosed Williams with depression and anxiety. The medical report estimated that Williams needed 25 hours off of work per month from February 15, 2014 until August 15, 2014. Thompson also wrote that she was "unable to determine [the] time frame [for Williams's recovery] at this time." The report recommended that Williams needed a "10 minute break every 2 hours," a "flexible start time," and "modified break time during anxiety attacks." It also recommended that Williams not work at all from April 11 to April 27. In a written statement accompanying Thompson's report, Williams requested "time for treatment of mental illness" and "flexible scheduling, leave for counseling, and modified break schedule." But nowhere in the report did Thompson or Williams explain how the proposed flexible-scheduling accommodation would actually work.

Williams repeatedly informed the IDSC that she was continuing to receive medical treatment and that she would submit additional paperwork. Her medical documentation indicated that, beginning in May, she was in therapy from at least 10:00 a.m. until 3:00 p.m. daily, which was expected to last until June 13. As of May 8, psychiatrist Dr. Madakasira opined that Williams was "not fit for work at this time," but that she could return at the end of the treatment program if released to do so at that time. But Dr. Madakasira did not identify any accommodations that would have allowed Williams to perform her job.

On June 11, another healthcare provider, therapist Debra Butler from HealthQuest, sent documentation to the IDSC, concluding that Williams was "unable to work at this time due to cognitive impairment and mood disturbance." Butler did not mention any accommodation requests, but estimated that Williams could return to work full-time on June 30.

On June 13, however, Williams called Attendance Analyst Lisa Todd-Kyle, stating that she would not be able to return to work until her outpatient treatment program concluded eight weeks later. Williams called Todd-Kyle again on June 24 to reiterate that she could not return to work by June 30 due to the ongoing treatment program. Medical documentation sent from HealthQuest on June 20 confirmed that Williams's treatment was projected to last until August 6.

**D.      Procedural background**

After filing a charging document with the EEOC and receiving a right-to-sue letter, Williams filed a complaint against AT&T in the district court.  The complaint alleged that AT&T had violated the ADA by failing to provide Williams with a reasonable accommodation, failing to engage in the interactive process of determining such an accommodation, and terminating Williams based on unlawful disability discrimination and retaliation for requesting an accommodation.

AT&T filed a motion for summary judgment.  In response, Williams moved for partial summary judgment on the issue of whether she was disabled under the ADA.  The district court granted partial summary judgment in favor of Williams, concluding as a matter of law that she was disabled.  But in a later ruling the court granted summary judgment in favor of AT&T on all of Williams's claims.  This timely appeal followed.

## II.  ANALYSIS

**A.      Standard of review**

We review de novo a district court's grant of summary judgment.  *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 301 (6th Cir. 2016).  Summary judgment is proper when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  We must view all evidence in the light most favorable to the nonmoving party in making this determination.  *Tennial*, 840 F.3d at 301.

**B.      Failure-to-accommodate claim**

Williams argues that AT&T violated the ADA by failing to provide her with a reasonable accommodation that would allow her to continue working despite her depression and anxiety attacks.  She sought accommodation in the form of leave from work for treatment, flexible scheduling, and additional breaks during her shifts.

The district court ruled that Williams was not qualified for her job as a CSR because she could not perform the essential function of attending work regularly and punctually. In addition, the court concluded that Williams's proposed accommodation was per se unreasonable because it sought to eliminate the essential job function of regular attendance and punctuality.

### 1. *Without an accommodation, Williams was unqualified for her position because of her excessive absenteeism.*

Failure to provide a reasonable accommodation to a disabled, but otherwise qualified, person in the workplace is deemed unlawful discrimination under the ADA. 42 U.S.C. § 12112(b)(5)(A); *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007). As a threshold matter in every disability-discrimination claim, a plaintiff must demonstrate that (1) she is disabled; and (2) she is "otherwise qualified for the position despite" her disability, either with or without a reasonable accommodation. *Id.* at 869 (quoting *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 452 (6th Cir. 2004)). An employee is deemed qualified only if she can perform all of the essential functions of her job, whether accommodated or not. 42 U.S.C. § 12111(8).

In the present case, Williams argues that she would have been qualified for the CSR position if a reasonable accommodation had been granted. AT&T responds that Williams's poor attendance record shows that she was not qualified because she could not perform the essential function of regularly attending her job. Similarly, AT&T argues that the flexible scheduling and modified breaks that Williams proposed would not have enabled her to perform the essential function of regular attendance.

We must first determine whether regular attendance is an essential function of Williams's position. In making this determination, the ADA instructs us to consider evidence of the employer's judgment, which can include any written job descriptions prepared prior to advertising and interviewing applicants for the job at issue. 42 U.S.C. § 12111(8). Regular attendance is especially likely to qualify as an essential job function after this court's recent en banc holding that "[r]egular, in-person attendance is an essential function . . . of most jobs, especially the interactive ones." *EEOC v. Ford Motor Co.*, 782 F.3d 753, 762–63 (6th Cir. 2015)

(en banc) (concluding that an employee who had excessive absences was not qualified for her job, and that her request to work from home as an accommodation was not reasonable).

The *Ford* decision was based in part on an analysis of the factors outlined in 29 C.F.R. § 1630.2(n)(iii) for determining whether a particular job function is essential. *Id.* at 763. "Commonsense notions" that physical presence at work is important to most jobs, the court concluded, also supported this outcome. *Id.* at 762–63. Even before *Ford*, this court had held that plaintiffs with excessive absences were not qualified individuals when they failed to perform the essential function of regularly attending their jobs. *See Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 420 (6th Cir. 2004) (concluding that an employee who was terminated because of excessive absences that were unrelated to diabetes was not qualified, and would not be qualified due to these absences even if her accommodation request for medical leave were granted); *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1047 (6th Cir. 1998) (concluding that an employee was not qualified because she had been on a year-long medical leave of absence, and her physician had not released her for work or specified a date on which she would be able to return).

The *Ford* decision leaves open the possibility that regular attendance might not be an essential function of every job, but suggests that exceptions will be relatively rare. *See EEOC v. Ford*, 782 F.3d at 762–63. Here, AT&T's judgment and much of the evidence in the record support the conclusion that regular attendance is an essential function of the CSR position. AT&T maintains strict Attendance Guidelines, under which absences and tardiness of as little as five minutes result in attendance points. An accumulation of eight attendance points can lead to a CSR's termination. In addition, the Attendance Guidelines themselves state that regular attendance is an essential function of the CSR position. We regard this statement as persuasive evidence of AT&T's evaluation of the job, especially because the Attendance Guidelines predate this litigation. *See* 42 U.S.C. § 12111(8) (providing that written job descriptions "shall be considered evidence of the essential functions of the job" when prepared prior to advertising openings or interviewing for the position at issue); *see also EEOC v. Ford*, 782 F.3d at 761–62 (explaining that job descriptions prepared prior to litigation are properly considered).

In addition, the declarations of AT&T managers Payne and McArthur support the point that regular attendance is essential to the functioning of the Memphis Call Center for the reasons set forth in Part I.A. above. This court has previously considered similar testimony from employers as evidence that attendance is an essential job function. *See, e.g.*, *Brenneman*, 366 F.3d at 420 (concluding that regular attendance was an essential function based on a supervisor's affidavit that the "plaintiff's excessive absences placed a great strain" on the workplace because other employees would have to fill in for the plaintiff, decreasing morale). Williams puts forth no competing evidence on these points. We therefore conclude that regular attendance is an essential function of the CSR position.

Williams's poor attendance record makes clear that, unless some accommodation was possible, she could not perform the essential function of regularly attending her job. She was absent from work for entire months in 2013 and 2014. Most notably, she took a six-month leave from January to July 2013 and a nearly three-month leave from April 2014 until her termination in July 2014. Many of her unscheduled absences were not approved for STD leave. Williams accumulated 16 attendance points for these absences, double the 8 points meriting termination under AT&T's Attendance Guidelines. This was clearly excessive absenteeism.

Williams does not dispute that she was absent on the days documented by AT&T. Before the district court, she challenged only AT&T's calculation of her attendance points, arguing that the code AT&T used to classify certain absences suggests that points were improperly assessed for some absences that were scheduled in advance. But AT&T produced evidence that the code was in fact properly applied, and Williams has not produced any competing evidence. Williams vaguely maintains on appeal that she disputes AT&T's calculation of attendance points, but she does not explain how the calculation was incorrect, nor does she cite to any evidence in the record. Unless a reasonable accommodation could be instituted, Williams was not qualified for her job on the basis of her attendance record.

**2.      *Williams failed to propose any reasonable accommodation that would have allowed her to perform the essential functions of her job.***

Although this court concluded in *Ford* that excessive absenteeism was enough to render an employee not qualified, it did not stop there. The *Ford* court also evaluated whether the

employee had proposed a reasonable accommodation that would allow her to perform the essential functions of her job. *EEOC v. Ford*, 782 F.3d at 763. It held that the employee's proposed accommodation—a request to work from home—was unreasonable as a matter of law. *Id.* Here, Williams has alleged that she would have been able to perform her essential job functions using a combination of leave, flexible scheduling, and modified break times. We therefore evaluate whether she would have been "otherwise qualified" for her CSR position with these proposed accommodations and, if so, whether these accommodations were reasonable.

### a. *Williams has not shown that she would have been otherwise qualified with flexible scheduling and modified breaks.*

Williams's accommodation requests for flexible scheduling and modified breaks were based on the following submissions: (1) Thompson's evaluation, which stated that Williams needed a flexible start time and ten-minute breaks every two hours, (2) Williams's accompanying statement that she was requesting a flexible start time and a modified break schedule, and (3) Williams's verbal statements to Scruggs and Prude-Anderson that she needed accommodations. But none of these requests explain how the proposed accommodations would have enabled Williams to perform the essential functions of her job.

Williams's own deposition testimony reveals that she could not have worked on a regular basis even with her requested accommodations. She explained in her deposition that she needed the modified break schedule to allow her to calm down after stressful calls. When these calls provoked anxiety attacks, Williams needed to log off of her workstation and cease taking further calls. In other words, Williams essentially admitted that she could not perform her job duties during her anxiety attacks.

Williams provided no explanation for how Thompson's specific recommendation of ten-minute breaks every two hours would alleviate this problem. Williams admitted in her deposition that she had no way of predicting when her anxiety attacks would occur or how many attacks she would have per day. Breaks every two hours would therefore be inadequate if Williams suffered from an anxiety attack in between scheduled breaks.

In addition, the medical evidence reveals that Williams could not work *at all* for significant periods of time. Dr. Madakasira opined that Williams was "not fit for work" while she was undergoing treatment in May 2014. On June 11, therapist Debra Butler wrote that Williams was "unable to work at this time due to cognitive impairment and mood disturbance." And Thompson noted that Williams was unable to work from April 11–30 and May 28–June 8. These excluded work days were listed in the same evaluation that recommended a flexible start time and break schedule, suggesting that Williams would have been unable to work on those dates even with the proposed accommodations.

Finally, Williams herself stated in her appeal of the denial of STD leave that, from May 28 to June 9, she "could not function at work in a call center environment" and "could not focus mentally due to mental illness." Williams has thus failed to make a prima facie showing that she would have been otherwise qualified even with these accommodations. We therefore need not consider whether these accommodations, as framed by Williams, were reasonable.

### b.     *Williams's request for additional leave as an accommodation was not reasonable.*

Williams also argues that her requests for STD-approved leave doubled as requests for reasonable accommodations under the ADA. This court has previously held that medical leave can constitute a reasonable accommodation under the ADA. *See Cehrs v. Ne. Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 783 (6th Cir. 1998). But even if we were to assume that Williams was qualified for her position with the accommodation of leave, her request for additional leave was unreasonable. An employer is not required to keep an employee's job open indefinitely. This court has held that additional leave is an objectively unreasonable accommodation where an employee has already received significant amounts of leave and has demonstrated "no clear prospects for recovery." *Walsh v. United Parcel Serv.*, 201 F.3d 718, 727 (6th Cir. 2000). A physician's estimate of a return date alone does not necessarily indicate a clear prospect for recovery, especially where an employee has repeatedly taken leaves of unspecified duration and has not demonstrated that additional leave will remedy her condition. *See Maat v. County of Ottawa*, 657 F. App'x 404, 412–13 (6th Cir. 2016) (concluding that where an employee had already received substantial leave, additional leave was not a reasonable accommodation because

her physician's vague estimate of a return date was uncertain and indicated that she might need further treatment); *Aston v. Tapco Int'l Corp.*, 631 F. App'x 292, 298 (6th Cir. 2015) (concluding that additional leave was not a reasonable accommodation where an employee had already received a 26-week leave and had provided a physician's estimate of a return date, but had also submitted evidence that she still needed another medical procedure which would require recovery time beyond that date).

In the present case, AT&T provided Williams with retroactively approved STD leave and allowed her to retain her position for many months before terminating her in July 2014. Williams submitted an evaluation from Thompson that provided a return date of August 15, 2014, but Thompson stated that this date was only an estimate. Given that Williams had a history of taking leaves, that her condition failed to improve during those leaves, and that she repeatedly failed to return to work by dates on which her treatment providers had previously estimated that she would be able to return, requiring AT&T to grant further leave as an accommodation would be unreasonable.

**C.      Williams's claim that AT&T failed to engage in the interactive process**

Williams also asserts an ADA claim against AT&T for failure to engage in the interactive process. An employer is required "to initiate an informal, interactive process" when necessary to determine how an employee's disability limits her ability to work and to identify appropriate reasonable accommodations. 29 C.F.R. § 1630.2(o)(3). But an employer's failure to engage in the interactive process is actionable only if the employee can demonstrate that she was qualified for the position. *EEOC v. Ford*, 782 F.3d at 766. In other words, if the employee fails to create a genuine dispute of material fact that a reasonable accommodation would have allowed her to perform the essential functions of her job, she cannot survive summary judgment on an interactive-process claim. *Id.* Because we conclude that Williams has failed to make a prima facie showing that she was qualified for her position as a CSR with or without a reasonable accommodation, we need not consider whether AT&T failed to engage in the interactive process.

**D.      Disparate-treatment claim**

Williams further argues that her termination was the result of unlawful disability discrimination.   We analyze disability-discrimination claims under the *McDonnell Douglas* burden-shifting framework.  *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011).  To make out a prima facie case, a plaintiff must demonstrate that (1) she has a disability, (2) she is "otherwise qualified for the position, with or without reasonable accommodation," (3) she "suffered an adverse employment decision," (4) her employer "knew or had reason to know" of her disability, and (5) she was replaced or her position remained open.  *Id.* (quoting *Macy v. Hopkins Cty. Sch. Bd. of Educ.*, 484 F.3d 357, 365 (6th Cir. 2007)).  If the plaintiff makes out a prima facie case, the burden then shifts to the employer to demonstrate that there was a legitimate, nondiscriminatory reason for the adverse employment action.  *Id.*  The plaintiff must then show that the reason given by the employer was actually a pretext designed to mask unlawful discrimination.  *Id.*

As discussed above, Williams failed to produce sufficient evidence to create a genuine dispute of material fact as to whether she was qualified for her position, with or without a reasonable accommodation.  Because we conclude that Williams was not qualified as a matter of law, we need not proceed beyond the prima facie stage.  AT&T was therefore entitled to summary judgment on Williams's disability-discrimination claim.

**E.      Retaliation claim**

Williams's final contention is that AT&T terminated her in retaliation for requesting an accommodation under the ADA.  AT&T responds that it terminated Williams because of her excessive absenteeism, not because of her accommodation requests.

Retaliation claims are also analyzed under the *McDonnell Douglas* framework where, as here, there is no direct evidence of retaliation.  *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014).  To make out a prima facie case of retaliation, a plaintiff must demonstrate that (1) she engaged in protected activity under the ADA, (2) her employer was aware of that activity, (3) she suffered an adverse employment action, and (4) a "causal connection" existed between the protected activity and the adverse action.  *Id.*  If the plaintiff does so, then the burden shifts to

the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *A.C. ex rel. J.C. v. Shelby Cty. Bd. of Educ.*, 711 F.3d 687, 697 (6th Cir. 2013). The plaintiff must then show that the reason given by the employer was actually a pretext designed to mask retaliation. *Id.*

Williams contends that her proof was sufficient to establish a prima facie case of retaliation. AT&T disputes this, with the key question being the alleged causal connection between Williams's requests for accommodation and the termination of her employment. Because we agree with the district court's determination that AT&T's articulated reason for firing Williams was both legitimate and nondiscriminatory, we will assume without deciding that Williams established her prima facie case. This allows us to proceed directly to the question of pretext.

To establish pretext, a plaintiff must demonstrate "*both* that the employer's proffered reason was not the real reason for its action, *and* that the employer's real reason was unlawful." *EEOC v. Ford*, 782 F.3d at 767 (emphasis in original). Williams has not created a genuine dispute of material fact under this standard.

Although temporal proximity can demonstrate a causal connection for the purposes of a prima facie case, it alone cannot establish pretext. *Donald v. Sybra, Inc.*, 667 F.3d 757, 763 (6th Cir. 2012). Williams cannot create a genuine dispute of material fact on her retaliation claim by simply asserting that she was terminated soon after asking for additional leave. And Williams has produced no other evidence of pretext. There is ample evidence in the record that AT&T was poised to terminate Williams for legitimate business reasons—her poor attendance record—well before late June of 2014. AT&T managers and human resources personnel, including Area Manager Payne and Attendance Analyst Todd-Kyle, discussed terminating Williams as early as June 11. And Payne testified that before terminating Williams, AT&T confirmed that she had enough attendance points for termination without regard to whether her appeal for absences from May 28 onward succeeded.

A reasonable juror could not find that Williams's termination was pretexutal under any of the theories that she asserts. In the section of her brief on disparate treatment, Williams advances

three theories to support her claim that AT&T's use of the Attendance Guidelines to terminate her was pretextual: (1) AT&T failed to follow its own policies, (2) AT&T provided shifting reasons for terminating her, and (3) AT&T inconsistently applied the Attendance Guidelines to other employees. Williams's brief does not explicitly make this argument with regard to her retaliation claim. But even assuming that Williams has not waived these arguments, she has not put forth sufficient evidence of pretext to create a genuine dispute of material fact.

First, Williams does not cite to any evidence in the record to establish that AT&T failed to follow its policies in terminating her. Williams cites AT&T's IDSC Guide for the Guide's explanation of how an employee can request time off as an accommodation, and she argues that AT&T terminated her despite her proper use of this procedure. But the policy that Williams cites addresses procedures for employees, not AT&T, to follow. Williams points to no other evidence of a policy that AT&T failed to follow. She insists that AT&T engaged in a pattern of denying STD leave, assessing attendance points against her, retroactively approving STD leave, and ultimately "us[ing] the alleged incurred points to fire her." The record in fact reflects that AT&T denied Williams's STD leave requests on multiple occasions and then retroactively approved them. But this does not indicate a discriminatory or retaliatory motive.

Whenever AT&T retroactively approved STD leave, any attendance points that Williams incurred during the relevant time period were removed. And when calculating the attendance points needed to terminate Williams, her managers assumed that her final STD leave request, which had initially been denied, would be approved. They ultimately concluded that her absenteeism was a terminable offense even without the disputed points.

Second, Williams has not created a genuine dispute of material fact regarding her claim that AT&T provided "changing rationales" for terminating her. She argues that AT&T's final return-to-work letter provided her with an explanation of how she could obtain approval for additional leave and keep her job. Her termination after she followed those instructions, she contends, was inconsistent with this letter and occurred "without warning." Williams argues that AT&T informed her that she was terminated either because she had failed to properly make an ADA request for leave as an accommodation or because her request for leave had not been approved. She appears to be referring to her termination letter, although she does not cite it. The

"shift" in AT&T's reasoning, according to Williams, is its invocation of the Attendance Guidelines as an explanation for her termination after sending her this letter.

A reasonable juror could not find that these alleged shifting reasons for termination were pretextual. True enough, the termination letter did state that Williams's failure to properly request leave for her absences after May 27 was the reason for her termination. Attendance points were not mentioned in that letter. But the other evidence in the record overwhelmingly indicates that Williams's managers at AT&T were careful to ensure that they did not factor absences meriting STD leave into Williams's termination, gave Williams multiple chances to return to work before firing her, and decided to terminate her based on unscheduled absences that had resulted in attendance points. Evidence documenting this legitimate, nondiscriminatory rationale for termination predates the termination letter on which Williams so heavily relies.

Furthermore, the cases on which Williams relies for the proposition that shifting reasons can constitute pretext are factually distinguishable from the present case. They involve situations where an employer's proffered reason for termination changed after litigation commenced, or where an employer claimed that an employee was terminated for alleged poor performance but had not previously informed the employee that his or her performance was inadequate. *See, e.g.*, *Pierson v. Quad/Graphics Printing Corp.*, 749 F.3d 530, 540–41 (6th Cir. 2014) (concluding that evidence of shifting reasons created a genuine dispute of material fact where the employer initially told the plaintiff that he was fired due to a reduction in the workforce, but later informed the plaintiff that his poor performance was the reason for termination when the plaintiff mentioned appealing the decision); *Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 589–92 (6th Cir. 2002) (concluding that there was a genuine dispute of material fact regarding pretext where the employer claimed that an employee was fired for poor work performance, but repeatedly gave him merit-based bonuses, did not inform him of performance deficiencies until after terminating him, and did not mention poor performance as a rationale for the termination until answering interrogatories for the purposes of litigation).

In contrast to the plaintiffs in the above cases, Williams had been repeatedly warned about her attendance issues throughout the course of her employment. And AT&T produced evidence predating its termination decision to show that Williams's absenteeism was the actual

reason for her termination.  We conclude that Williams has failed to produce sufficient evidence to create a genuine dispute of material fact as to whether her excessive absenteeism was not the "real reason" for her termination.  *See EEOC v. Ford*, 782 F.3d at 767.

Finally, Williams asserts as evidence of pretext that AT&T treated her differently from other employees under the Attendance Guidelines.  She produced the attendance records of several other employees in support of this argument.  The district court noted that these records had not been properly authenticated, but concluded that even if they were authenticated at trial, Williams had not provided enough context to establish that she was treated differently from similarly situated coworkers.

We agree that the attendance records are insufficient to create a genuine dispute of material fact.  To establish pretext, Williams must show that these coworkers were "similarly situated" to her, meaning that they had the same supervisor, were governed by the same standards of conduct, and had committed the same Attendance Guidelines violations as Williams, without any "differentiating or mitigating circumstances" that would merit different treatment.  *See Smith v. Leggett Wire Co.*, 220 F.3d 752, 762 (6th Cir. 2000) (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)).  Williams must also show that these coworkers were not fired despite engaging in conduct that was substantially similar to hers.  *Id.*  The attendance and disciplinary records in themselves do not provide any context about the types of absences at issue or the coworkers' circumstances.  Williams offers her own unsubstantiated speculations about what the records show in her response to AT&T's statement of facts, but this does not set out facts that would be admissible at trial and therefore is not sufficient evidence to create a genuine dispute of material fact.  *See* Fed. R. Civ. P. 56(c).

### III.  CONCLUSION

In the end, this case reflects the reality that there are some jobs that a person with disabilities is simply unable to perform.  A blind person cannot be an airline pilot, nor can one with advanced Parkinson's disease be a neurosurgeon.  Similarly, a person like Williams who reacts to random customer calls with anxiety attacks that require her to log off of her workstation

is not capable of performing the essential job functions of an AT&T CSR.  We therefore **AFFIRM** the judgment of the district court.