NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0222n.06

Case No. 23-1625

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| ANNA MCKINNEY, | ) | **FILED** |
| Plaintiff - Appellant, | ) | May 22, 2024 |
|  | ) | KELLY L. STEPHENS, Clerk |
| v. | ) |  |
|  | ) | ON APPEAL FROM THE UNITED |
| MACOMB COUNTY, MICHIGAN, | ) | STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| Defendant - Appellee. | ) |  |
|  | ) | OPINION |
|  | ) |  |

Before: GIBBONS, McKEAGUE, and STRANCH, Circuit Judges.

JULIA SMITH GIBBONS, Circuit Judge. For roughly fifteen years, Anna McKinney worked for Macomb County, Michigan ("the County"), as a provider of services to individuals with developmental disabilities in the community. Throughout her employment with the County, McKinney suffered from various mental illnesses. For the first decade, however, these conditions did not affect her performance at work. This changed during the last three years of her tenure. Because of the confluence of a new mental health diagnosis and a change in the pace of McKinney's job, McKinney's mental health—and job performance—continuously declined. The County placed McKinney on numerous performance improvement plans without success; McKinney, for her part, increased her medication and requested accommodations. Before the County fashioned appropriate accommodations, McKinney's health deteriorated and rendered her sometimes "unable to function." McKinney never returned to work, and after missing a deadline to submit updated medical documentation supporting her continued use of leave, the County

terminated her. McKinney sued under the Americans with Disabilities Act ("ADA"), but the district court granted summary judgment in favor of the County. For the following reasons, we affirm.

I.

For roughly fifteen years, Anna McKinney worked as a Supports Coordinator for Macomb County Community Mental Health. As a Supports Coordinator, McKinney was tasked with providing services to adults with developmental disabilities and their families. This entailed developing a service plan for each individual, known as a "consumer," and then meeting monthly with that consumer in either their home or in the community to continually assess the consumer's needs. In addition to meeting with consumers, Supports Coordinators like McKinney were tasked with coordinating with third-party service providers, documenting the consumers' progress, and keeping records so that provided services could be billed to Medicaid. Despite suffering from depression and anxiety, all agree that McKinney performed her job without issue for the first decade of employment.

Manifestations of McKinney's mental illnesses worsened in 2015, when McKinney was diagnosed with attention deficit hyperactivity disorder ("ADHD"). Around this time, the nature and pace of McKinney's job also changed drastically. McKinney's position changed from a standard office environment—except for visits with consumers out in the community—to a mobile office environment, which required McKinney to complete much of the required paperwork at a mobile office station. McKinney struggled with the myriad procedures and "being on the road all the time" as required. DE 18-6, McKinney Dep., Page ID 491. The mobile office format also required McKinney to fill out documentation in front of consumers, which she found difficult to do in light of the noise and distractions. Sometimes McKinney could go to a public library or

2

mobile office around the county to focus, but such offices sometimes lacked space and her ADHD made her ability to focus on the task at hand somewhat unpredictable. McKinney acknowledged that, with ADHD, "sometimes you're on it, you know, and you can focus and do your stuff. And other times you better be out in the community because you can't focus well." *Id.* at Page ID 492. The position now "required quite a bit of multitasking," and McKinney's ADHD contributed to her difficulties "changing tasks back and forth," as was required of her throughout each day. *Id.* at Page ID 493–94. This also bled over into difficulties in meeting with consumers on time and in completing the required documentation associated with the visits.

In 2016, McKinney began taking leave under the Family and Medical Leave Act ("FMLA") due to her mental illness. In one instance, McKinney was hospitalized for her depression. Tracy Mancini, McKinney's then-supervisor, noticed her work performance and mental health declining. McKinney's caseload also increased greatly, rising to fifty-eight consumers in 2017. In October of 2017, Mancini put McKinney on a performance improvement plan ("PIP") to ensure McKinney met with consumers monthly, as required by their service plans, and to address her difficulties with completing service reviews and progress notes on time and maintaining accurate records of her schedule. To address these problems and help McKinney focus, Mancini would meet with McKinney for an hour and a half every week to complete the necessary documentation and correct inaccuracies. Even with this assistance, McKinney did not achieve the goals identified.

In 2018, Steve Smith became McKinney's direct supervisor, and renewed McKinney's PIP based on many of the deficiencies identified by Mancini. During this PIP, McKinney's performance somewhat improved, but she still failed to meet many of the PIP's goals concerning timely and accurate documentation. McKinney asserts that, in March of 2018, her doctor wrote

an accommodations request for McKinney to be submitted to the County's human resources department. McKinney asserts that she informed Smith of her need for accommodations at this time, but he declined to take her request to human resources and ultimately conveyed that her request was denied. The County contests this description of events, but Smith concedes that he became aware of McKinney's request for an accommodation—namely working from home—by June of 2018. Smith contends that he did not deny McKinney's request, but instead encouraged her to file a formal request with human resources, and immediately gave her a private office space to use in the interim to address her concerns about the noise. According to Smith, McKinney did not use the private office. According to McKinney, she was not given any accommodation.

Throughout the rest of the year, McKinney's performance continued to decline. Smith felt that McKinney "required constant support and monitoring to keep all of her cases moving forward." DE 18-9, Smith Dep, Page ID 610. To this end, Smith and McKinney continued to meet weekly, and Smith typed up all of McKinney's case appointments and deadlines for "all the months of the year . . . so she would have a visual to be able to see what she had to do." *Id.* at Page ID 619. He deemed this necessary because McKinney could not "manag[e] those things independently." *Id.* Smith also "significantly" reduced McKinney's caseload and reassigned some of her consumer cases to other staff. Some of the requests for reassignment were made by the consumers' families themselves. By January of 2019, McKinney's caseload was reduced to thirty-five, with reductions implemented in light of her "inability to keep up with visits and/or plans." DE 18-11, Garr PIP, Page ID 640. Around this time, the average caseload for a Supports Coordinator was between forty-five and fifty consumers. Even with this supervision and reduced caseload, McKinney continued to struggle. Smith found that she had a pattern of becoming "overly involved" with some families at the expense of providing the required services to other families.

DE 18-9, Smith Dep., Page ID 623–24. She failed to see some consumers at the required monthly interval. McKinney also failed to timely submit progress notes and service plans. In some instances, the failure to submit documentation caused families to lose out on services. McKinney also commonly submitted inaccurate attendance documentation concerning her schedule, which had to be corrected in her weekly PIP meetings. McKinney continued to struggle with her performance through 2019, and another supervisor renewed her PIP.

In early 2019, McKinney reportedly submitted FMLA paperwork containing a renewed request for reasonable accommodations. McKinney contends that the County failed to initially even read her accommodation request. In February, she met with multiple HR representatives with respect to her requested accommodation. McKinney requested remote work from her home as an accommodation, and the County in turn requested medical documentation and indicated that it would follow up. In March, McKinney submitted medical documentation from her psychologist, Dr. Deborah Greening, who noted that McKinney had trouble multitasking, being on time to work, and working in a noisy environment. Greening recommended that the County allow McKinney to do paperwork from home and allow her time to attend health appointments and be late on occasion.

An HR representative set up a meeting to discuss the requested accommodations with McKinney in early April, but McKinney did not show up to the meeting. After April 8, 2019, McKinney never returned to work. Over the next couple of months, McKinney used up her FMLA leave and began using unpaid leave pursuant to her collective-bargaining agreement. If supported by medical documentation, she could remain on such leave for up to twelve months. The County made several attempts to reach out to McKinney to obtain medical documentation to extend her leave. The County received no response from McKinney. Instead, McKinney filed a charge with the EEOC in May. Eventually, the County received medical documentation from Greening

indicating that McKinney was "unable to function," so the County extended McKinney's leave accordingly. After McKinney missed another deadline to submit medical certification to support an additional extension of leave, the County terminated McKinney.

McKinney submitted medical certification roughly a week after the deadline and then checked herself into a hospital for her mental illness. McKinney filed suit roughly a year and a half later.

## II.

We review a district court's grant of summary judgment de novo. *Cooper v. Dolgencorp, LLC*, 93 F.4th 360, 368 (6th Cir. 2024) (citing *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 606 (6th Cir. 2019)). Summary judgment is warranted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At this stage, we view all facts and make all inferences in the light most favorable to McKinney, the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III.

On appeal, McKinney challenges the district court's grant of summary judgment on her claims that the County failed to accommodate her, failed to engage in the mandated interactive process, and retaliated against her. Because we find McKinney's failure-to-accommodate claim dispositive of her interactive-process claim, we analyze those together. Ultimately, we find the district court's grant of summary judgment appropriate on all three counts.

## A.

The ADA prohibits employers from discriminating against employees because of a disability. 42 U.S.C. § 12112(a). Prohibited discrimination includes "not making reasonable

accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability" unless the accommodations would impose an undue hardship on the employer. *Id.* § 12112(b)(5)(A). As a threshold matter, "to access the [ADA's] remedy," a plaintiff carries the burden to show that she is: (1) disabled; and (2) otherwise qualified for the relevant position despite her disability. *Cooper*, 93 F.4th at 365; *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 391 (6th Cir. 2017). The parties do not contest that McKinney was disabled. This case turns on the second element of the prima facie case, whether McKinney was a qualified individual.

An employee is qualified "if she can perform all of the essential functions of her job," either with or without reasonable accommodations. *Williams*, 847 F.3d at 391; 42 U.S.C. § 12111(8). McKinney argues that she was qualified because she could perform all essential functions of a Supports Coordinator with a combination of her requested accommodations: the ability to work from home "for most of her weekly working time" and utilization of flexible scheduling, i.e., packing her client visits on certain days and leaving other days for paperwork.[1] CA6 R. 26, Appellant Br., at 13.

A proposed accommodation is not reasonable if it removes an essential function from an employee's role. *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 761 (6th Cir. 2015) (en banc). Accordingly, we first identify which underlying duties of the Supports Coordinator job are essential, and then whether McKinney carried her burden of introducing evidence from which a reasonable juror could find that she could perform these essential functions working from home

---

[1] McKinney's brief also mentions a leave of absence as a reasonable accommodation that would enable McKinney to perform the essential functions of her job. Other than this mention, McKinney fails to develop any argument supporting this contention, and the district court noted that it did not consider leave in its assessment for largely the same reason. Accordingly, we will not construct an argument that McKinney does not make. *Tillman Transp., LLC v. MI Bus. Inc.*, 95 F.4th 1057, 1064 (6th Cir. 2024).

and using a flexible schedule. *See id.* at 763 ("The *employee* bears the burden of proposing an accommodation that will permit her to effectively perform the essential functions of her job." (emphasis in original)). In determining whether a job function is "essential," as opposed to marginal, the ADA directs courts to consider the employer's judgment and job descriptions written before litigation. 42 U.S.C. § 12111(8); *see also Williams*, 847 F.3d at 392 (citing *Ford*, 782 F.3d at 761–62) (job descriptions prepared prior to litigation are properly considered). Courts should additionally consider whether the job duty is essential "because (1) the position exists to perform the function, (2) a limited number of employees are available that can perform it, or (3) it is highly specialized." *Cooper*, 93 F.4th at 369 (quoting *Rorrer v. City of Stow*, 743 F.3d 1025, 1039 (6th Cir. 2014)). The employer's judgment about whether a duty is essential receives weight but is not dispositive. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 854–55 (6th Cir. 2018).

The applicable job description articulated the Supports Coordinator position as requiring "home and community[-]based interventions," meeting County "record keeping requirements," and working with third parties "to ensure timely and accurate service provision," among other things. DE 18-5, Job Description, Page ID 477. While McKinney's brief contends that she made a "compelling showing" of her ability to perform the essential duties of her position "soundly and effectively from home," *see* CA6 R. 26, Appellant Br., at 14, the record does not support this contention.[2]

---

[2] McKinney's briefs repeatedly refer to information without citation to "parts of the record on which the appellant relies." Fed. R. App. P. 28(a)(8)(a). Upon this court's review, much of this information does not appear in the record at all, such as McKinney's contention that six anonymous employees "comparable in all material ways to McKinney" were permitted to work from home. CA6 R. 26, Appellant Br., at 14. The same goes for McKinney's references to Dr. Nina Anderson's medical opinions. A plaintiff's burden of showing that she was an otherwise qualified individual is "not an onerous one," but it does require identification of evidence *in the record* supporting that view. *Cooper*, 93 F.4th at 370 (quoting *Hostettler*, 895 F.3d at 855).

*Recordkeeping and Documentation.* First, consider timely recordkeeping, which was an "absolute requirement" for proper service billing to Medicaid. DE 18-9, Smith Dep., Page ID 614. The failure to maintain accurate records concerning services provided to each client could "trigger action from Medicaid." *Id.* The district court found this documentation essential, and McKinney herself recognized the essential nature of "keep[ing] clients on Medicaid" to receive services. DE 18-6, McKinney Dep., Page ID 499. The County kept strict deadlines, in part, because some of this documentation had to be submitted to third-party providers. As referenced above, the Supports Coordinator job description further supports the conclusion that recordkeeping to sustain Medicaid billing and track the provision of services were essential parts of the job. DE 18-5, Job Description, Page ID 477 (describing recordkeeping and ensuring timely service provision, among other things, as "essential functions and responsibilities"); *see* 42 U.S.C. § 12111(8) (considering written job descriptions as evidence of essential functions).

The County presented evidence that McKinney failed to consistently perform essential documentation duties from 2017 to her termination in 2019. In some cases, these deficiencies caused more than internal strife. McKinney's failure to submit documentation caused some families to lose out on services that otherwise would have been provided. McKinney acknowledged that she "couldn't write the report[s] like [the County] wanted." DE 18-6, McKinney Dep., Page ID 531. McKinney's failure to timely and accurately keep records occurred even with time set aside each week to correct McKinney's submissions with a supervisor, with Smith typing up all of McKinney's case appointments and deadlines for "all the months of the year," and with a reduced caseload. DE 18-9, Smith Dep., Page ID 610–11, 619–21.

McKinney argues that her proposed accommodations of working from home and on a flexible schedule would enable her to competently complete this required documentation by

enabling her to focus on paperwork one day and clients the next, and by allowing her to work from home, where she presumably faces fewer distractions. True, working from home can sometimes enable employees to perform essential tasks they otherwise could not perform in-person due to a disability, *see Mosby-Meachem v. Memphis Light, Gas & Water Div.*, 883 F.3d 595, 603–04 (6th Cir. 2018) (plaintiff pointed to testimony by coworkers confirming her ability to perform essential functions from home), but McKinney has pointed to nothing in the record suggesting this would be true for her. *Cf. Hostettler*, 895 F.3d at 855 (plaintiff created genuine dispute by pointing to evidence that she performed all essential duties of position with accommodation). Instead, the record shows that working from home most days of the week as requested would not enable McKinney to correct her inability to complete the required documentation in a timely and accurate manner. *See Ford*, 782 F.3d at 763.

For example, McKinney has not identified how working from home on a flexible schedule might resolve the difficulties she has in schedule-management and documentation as a result of her ADHD. With ADHD, McKinney found her ability to focus unpredictable. DE 18-6, McKinney Dep., Page ID 492. Although utilization of a home office rather than a shared office may minimize distractions, McKinney does not demonstrate how changing the location of where she performed her documentation duties would improve her ability to self-manage her case responsibilities, which she was already unable to do with the assistance of others and on a reduced caseload.

Moreover, McKinney's brief claims that she already did not spend much time at the mobile offices, suggesting that substituting her office time for working from home would not address many of the situations McKinney found stressful and in which she performed deficiently. McKinney estimates that 70% of her time was spent either meeting with consumers, commuting

to or from these meetings, or performing paperwork on-the-go as required. CA6 R. 26, Appellant Br., at 17 n.4. This suggests that working remotely would not address her struggles to comply with "[l]ots of procedures" and "being on the road all the time." DE 18-6, McKinney Dep., Page ID 491; *see Williams*, 847 F.3d at 394 (rejecting claim where the plaintiff "provided no explanation" for how proposed accommodation of pre-scheduled breaks would ameliorate anxiety attacks that could occur at any time).

McKinney's history of non-responsiveness when she was unsupervised also suggests that working from home would not enable her to perform the job's essential functions. These deficiencies went beyond mere absences from the mobile office locations which potentially could have been ameliorated with a remote work accommodation. *See Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 418–19 (6th Cir. 2020) (noting that absences due to disability "do not in and of themselves render [an employee] unqualified for [her] position"). McKinney's supervisors described her need for "constant support and monitoring," including her "need[] to have someone to advise her, [and] support her to get the basic elements of the job done," such as completing necessary records on time with the "accuracy and comprehensiveness" essential to the billing system, and the maintenance of a calendar reflecting accurate service provision. DE 18-9, Smith Dep., Page ID 610, 619–20. Moreover, McKinney often failed to accurately record her assignments and whereabouts as required when in the field, underscoring that reducing supervision would not better serve her performance in her position. In all, remote work would likely inhibit key supervision, and there is no evidence that it would have improved McKinney's recordkeeping and documentation performance. *See Ford*, 782 F.3d at 761.

*Consumer Services.* Other essential duties concerned the provision of services to consumers. Supports Coordinators like McKinney exist to get consumers needed services,

11

underscoring the essential nature of this function. *See Rorrer*, 743 F.3d at 1039. This cluster of duties entailed traveling to meet with consumers and their families at their homes or in the community and maintaining plans at the frequency required for each individual. The record demonstrates that McKinney inadequately performed some of these duties, and McKinney does not explain how completing her documentation tasks from home would ameliorate the deficiencies associated with consumer service. *See Williams*, 847 F.3d at 393–94.

McKinney's proposed accommodation schedule included packing her client days more tightly, but she noted that her ADHD caused her to struggle with time management. Sometimes, McKinney "planned a day to see like many people, and then [she'd] want to do that work. But then it came that [she] couldn't"—her ADHD led her to "always think [she] can do more than [she] can." DE 18-6, McKinney Dep., Page ID 494–97. This contributed to her spending more time than allocated with some consumers and being late or needing to reschedule meetings altogether with other consumers. Sometimes, McKinney failed to see consumers at the frequency required by their plans of service. As McKinney's health declined, some consumers requested to be taken off McKinney's rotation. McKinney's supervisors noted her inability to "keep up with visits and/or plans" with her consumers. DE 18-11, Garr PIP, Page ID 640. On this record, McKinney has not shown that allowing her to complete documentation at home, nor packing client visits on specific days, would resolve the problems she faced managing provision of services to her assigned consumers. At bottom, even with accommodations, her job would still require "travel from location to location to provide services" to consumers, which McKinney struggled to do in a timely manner. DE 24, Pl. Opp'n to Mot. for Summ. J., Page ID 764.

The conclusion that McKinney has not shown that she could have performed the essential functions of a Supports Coordinator even with reasonable accommodations is further supported by

McKinney's psychologist. McKinney's psychologist testified that, from the time of McKinney's first written request in March 2018 to her ultimate termination in July 2019, McKinney at no time "was well enough to work" even with the accommodations requested. DE 18-12, Greening Dep., Page ID 658. "When a plaintiff's own doctor—not merely the defendant employer—concludes that the plaintiff cannot perform [her] job . . . the plaintiff likely cannot establish that [she] is otherwise qualified . . . ." *Cooper*, 93 F.4th at 370 (citing *Dietelbach v. Ohio Edison Co.*, 1 F. App'x 435, 437 (6th Cir. 2001) (per curiam)); *see also Johnson v. Cleveland City Sch. Dist.*, 443 F. App'x 974, 986 (6th Cir. 2011). McKinney attempts to discredit Greening's position by highlighting that Greening was just one of multiple doctors seeing McKinney. But Greening is the only medical authority whose opinion appears in the record. And we have previously granted summary judgment to an employer where the plaintiff's doctor viewed the plaintiff as unfit to work, even if the evaluation had also recommended accommodations at the time. *See Williams*, 847 F.3d at 394. Greening's testimony thus further underscores McKinney's inability to perform the essential functions of the role.

McKinney tries to meet her burden primarily by arguing that in-person attendance was not an essential function of the Supports Coordinator role, as much of the work is performed out in the field, rather than at mobile office locations. Thus, if she could perform her work remotely, she would have proposed a reasonable accommodation that did not displace an essential function of her position. *Cf. Ford*, 782 F.3d at 763. To this end, McKinney points to the fact that others were allowed to work remotely pursuant to County policy as evidence that attendance was non-essential. The County admits that it has such a policy but contends that McKinney's history of inability to self-manage absent extensive supervision shows that in-person attendance was an essential part of the job for her. McKinney has not identified evidence in the record demonstrating that the

coworkers allowed to work from home had challenges related to attention and performance that working from home could exacerbate. And even if in-person office attendance were not an essential function of the Supports Coordinator position, McKinney still bears the burden of demonstrating that she could perform the other essential functions of her position with her proposed accommodation of working from home. *Id.* As described above, she has failed to do so.

Although McKinney points to her pre-2015 success as proof that she is qualified for her job, she admits that the nature of the position changed after that. She does not cite anything in the record demonstrating her ability to perform the essential duties of the position—even with proposed accommodations—during the time she was placed on PIPs and then terminated. This court is mindful not to weaponize a claimant's manifestations of disabilities that result in their inability to perform their job absent accommodation to defeat their very claim for accommodation. *See Fisher*, 951 F.3d at 418. But summary judgment is appropriate where, as here, McKinney presented no evidence indicating she would be able to perform the essential duties of her position with her requested accommodations, and her track record, supervisors' testimony, and even her doctor's testimony suggest that she could not.

Because McKinney failed to identify evidence that she was an otherwise qualified individual, her claim that the County failed to engage in good faith in an individualized inquiry to identify accommodations through an interactive process fails as well. *See Ford*, 782 F.3d at 766; *see also Williams*, 847 F.3d at 395 (deeming claims alleging a failure to engage in the interactive process "actionable only if the employee can demonstrate that she was qualified for the position");

*Rorrer*, 743 F.3d at 1041.[3]   We thus affirm summary judgment in favor of the County on McKinney's failure-to-accommodate and failure-to-engage-in-the-interactive-process claims.

B.

McKinney also alleged that the County terminated her in retaliation for her requests for reasonable accommodations and medical leave.  The district court determined that, assuming McKinney made out a prima facie case of retaliation, she failed to carry her burden of showing that the County's proffered non-discriminatory reason for terminating McKinney—her failure to provide timely medical documentation supporting the extension of leave—was pretext for discrimination.  Because McKinney failed to develop any argument supporting this claim in her opening brief, we deem this claim abandoned.  *Kuhn v. Washtenaw County*, 709 F.3d 612, 624–25 (6th Cir. 2013).

Although McKinney's statement of the question presented includes her retaliation claim, she otherwise makes no mention of it in her opening brief—failing entirely to address the district court's finding that McKinney failed to establish that the County's decision to terminate McKinney was pretextual.  Instead, McKinney focuses only on her ability to perform her position with reasonable accommodations that the County failed to provide.  The closest McKinney gets to addressing her retaliation claim is noting, in one sentence, that the County "constructively discharged McKinney over a year before" officially terminating her, enabling a reasonable jury to infer a causal connection between the County's failure to accommodate and the subsequent adverse

---

[3] Although McKinney asserts that the County had a duty to locate suitable transfer positions for her if her disability rendered her unqualified for her current position, McKinney offers no evidence that she sought transfer to a different position, that she notified the County of this desire, or that there were any suitable positions open.  *See Cooper*, 93 F.4th at 372 (noting the scope of an employer's burden to locate suitable positions when a transfer is *requested* by the employee).  This accordingly does not help McKinney make out her prima facie case.

employment action. CA6 R. 26, Appellant Br., at 14. But this does not address pretext—it does not show, or even suggest, that the County's proffered reason for discharge in July 2019 was not the real reason. *See Ford*, 782 F.3d at 767. We will not address "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation," nor will we reconstruct a party's argument for them. *United States v. Elder*, 90 F.3d 1110, 1118 (6th Cir. 1996) (citation omitted). We thus affirm summary judgment on McKinney's retaliation claim.

IV.

For the preceding reasons, we affirm the district court's grant of summary judgment.