RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 24a0030p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

CAMERON JOSEPH COOPER,

         *Plaintiff-Appellant*,

    *v*.

DOLGENCORP, LLC,

         *Defendant*,

COCA-COLA CONSOLIDATED, INC.,

         *Defendant-Appellee*.

No. 23-5397

─────────────

Appeal from the United States District Court for the Eastern District of Tennessee at Knoxville.
No. 3:20-cv-00362—Charles Edward Atchley, Jr., District Judge.

Argued: December 6, 2023

Decided and Filed: February 15, 2024

Before: MOORE, MURPHY, and MATHIS, Circuit Judges.

─────────────

**COUNSEL**

**ARGUED:** Clint J. Coleman, NELSON LAW GROUP, PLLC, Knoxville, Tennessee, for Appellant. Jeffrey D. Patton, SPILMAN THOMAS & BATTLE, PLLC, Winston-Salem, North Carolina, for Appellee. **ON BRIEF:** Clint J. Coleman, Jesse D. Nelson, NELSON LAW GROUP, PLLC, Knoxville, Tennessee, for Appellant. Jeffrey D. Patton, SPILMAN THOMAS & BATTLE, PLLC, Winston-Salem, North Carolina, for Appellee.

———————————

**OPINION**

———————————

MATHIS, Circuit Judge. Cameron Cooper has a disability that causes him to involuntarily utter racist and profane words. Even with the disability, Cooper (like many adults in America) needs to work to earn an income. Fortunately, the Americans with Disabilities Act ("ADA") provides a remedy for an employee whose employer discriminates against him for having a disability. But to access the remedy, the employee must be able to perform the functions of his job, with or without help (an accommodation) from his employer.

Coca-Cola Consolidated, Inc. ("CCCI") hired Cooper to deliver its products to its customers. Like many jobs that require an employee to interact with the employer's customers, Cooper needed to provide excellent customer service. Cooper's racist and profane language at times got in the way of him providing excellent customer service to CCCI's customers. Over the years, CCCI provided Cooper with various accommodations for his disability. CCCI's last accommodation to Cooper required him to transfer to a position with no contact with CCCI's customers. That transfer led to Cooper suing CCCI under the ADA for disability discrimination and constructive discharge.

The district court granted summary judgment to CCCI. For the reasons that follow, we affirm.

**I.**

In 2016, Cooper began working for CCCI as a delivery merchandiser. Prior to CCCI hiring Cooper, he had already been diagnosed with Tourette Syndrome. Tourette Syndrome causes unwanted, involuntary muscle movements and sounds known as "tics." For Cooper, his Tourette Syndrome has a rare tic symptom known as coprolalia. The condition causes Cooper to use obscene and inappropriate vocalizations, including profanity (bitch) and a racial slur (nigger).

CCCI knew about Cooper's tics at hiring, but apparently not to the full extent.  CCCI claims that its officials observed Cooper make a "whooping sound" with some head movements when CCCI hired Cooper and that his condition "progressed" over the course of his employment. R. 34-19, PageID 291, 301–04.  Cooper, on the other hand, contends his condition always included the use of profanity and the racial slur.  Although Cooper asserts that his condition did not change during his employment with CCCI, he acknowledges that anxiety, stress, and anger increase the frequency of his tics.

As a delivery merchandiser, Cooper delivered CCCI's products to various customer locations throughout northeast Tennessee.  CCCI's customers included retailers, such as Dollar General, that sold CCCI's products to end consumers.  According to a written job description, delivery merchandisers were responsible for "delivering, merchandising, [and] maintaining company standards at customer locations."  R. 34-1, PageID 177.  This included tasks such as filling shelves and coolers, stocking displays, rotating products, and removing out-of-date and damaged products.  Delivery merchandisers also "[f]oster[ed] relationship[s] with account personnel and provide[d] superior customer service to all accounts serviced."  *Id.*  The job required "[e]xcellent customer service skills."  *Id.*

CCCI allegedly became aware of customer complaints involving Cooper and his use of offensive language as early as fall 2016.  According to Robert Seiter, a CCCI manager responsible for customer complaints, CCCI received "numerous and ongoing" complaints about Cooper using offensive language while servicing customer stores.  R. 34-2, PageID 180.  One such incident led Seiter to document a formal complaint by a Dollar General manager against Cooper in September 2017.  That manager allegedly observed Cooper "frequently and freely" use a racial slur inside a Dollar General store while Cooper delivered products.  R. 34-3, PageID 183.  This incident apparently occurred in front of Dollar General's customers and an African American cashier, requiring the manager to apologize to those who witnessed the incident and remove Cooper from customers' view.  The Dollar General manager allegedly told Seiter this incident made him "very uncomfortable" and concerned for Cooper's safety, "as well as his customers and associates that may be offended by [Cooper's] tic word."  *Id.*

Around the time of the September 2017 complaint, Cooper met with a CCCI director and a human resources official. CCCI wanted to discuss the progression it perceived of Cooper's verbal tics. CCCI's representatives allegedly observed Cooper use racial slurs and other profanity during the meeting.

Around September 5, 2017, Cooper submitted, and CCCI approved, a Family and Medical Leave Act request. While on leave, Cooper adjusted his medication, sought out a new neurologist, obtained treatment from a counselor, and received acupuncture therapy. This seemed to help his tics, so Cooper returned to work.

In February 2018, CCCI learned of another incident involving Cooper's use of offensive language while servicing a different Dollar General store. Taylor Rogers assisted Cooper with his delivery on the day of this incident. According to Rogers, the Dollar General manager on duty did not want to work with Cooper because of his use of racial slurs. Rogers reported that he explained Cooper's condition to the manager, but the manager said Cooper's language still upset her and that she did not want Cooper to come to the store alone.

After this incident, CCCI adjusted Cooper's route so that he would not service Dollar General stores alone. In May 2018, Cooper took another period of leave and submitted a short-term disability claim. While on leave, Cooper requested an accommodation to allow him to return to work alongside another delivery driver "in the meantime while taking care of [his] situation." R. 34-10, PageID 201.

By August 2018, Cooper's physician released him to return to work but listed his work restrictions as: "Needs to be present with another driver." R. 34-9, PageID 199–200. And so, Cooper returned to work in a driver helper role. In that role, the helper had "very minimal" interaction with the customer store, while the driver would handle the check-in and any necessary conversations. R. 34-17, PageID 243–44; R. 34-18, PageID 259–60. But the driver helper role was a seasonal position. In any event, nothing in the record suggests that Cooper's physician ever removed this restriction.

In October 2019, another incident involving Cooper occurred at a Breadbox convenience store. A Breadbox store manager made a complaint against Cooper unrelated to his Tourette

Syndrome. CCCI's subsequent investigation revealed that the allegations against Cooper were unsubstantiated. But its investigation prompted meetings between CCCI officials, Cooper, and Cooper's coworkers. These meetings revealed that Cooper's tics were "once again out of control, and he was repeating the 'N-word' over and over through his daily route and in the presence of customers and consumers." R. 34-2, PageID 181–82.

In early December 2019, CCCI gave Cooper a limited choice for continued employment: take another leave of absence or transfer to a vacant, overnight warehouse position with no customer interaction. In response, Cooper asked CCCI to place him on a non-customer-facing delivery route, such as the "Dollywood route" or a "bulk delivery" route. Cooper had covered the Dollywood route previously. Cooper asserts that the Dollywood route was not customer facing when he worked it, and he believed it was open because his friend that was assigned to the route had quit. According to CCCI, the Dollywood route became a customer-facing position prior to December 2019 and there were no other non-customer-facing delivery routes open at that time.

Eventually, Cooper took the warehouse position. To avoid a "really bad" pay cut in that new role, Cooper requested that CCCI pay him $20 per hour instead of $18.50 per hour. R. 34-14. After some negotiation, CCCI agreed to pay Cooper $18.96 per hour for his role in the warehouse. This was a reduction from the $20.38 per hour Cooper made as a delivery merchandiser.

Cooper worked in the warehouse until April 2020. On April 22, 2020, Cooper called his direct supervisor to advise that he was resigning his employment to take another job. Cooper told his supervisor during that call that his choice to leave was "nothing against y'all[,] but I've got another job." 34-16, PageID 220–21. Since then, Cooper has worked as a delivery driver for Dealer's Warehouse. And he subsequently worked as a delivery driver for FedEx Freight. He contends that both positions were almost identical to his role as a delivery merchandiser at CCCI. And in his post-CCCI positions, Cooper has not received any complaints about his Tourette Syndrome, nor has any objection been raised as to him "having a customer-facing role." R. 42-5, PageID 515.

Cooper filed suit against CCCI asserting four claims under the ADA: (1) failure to accommodate, (2) constructive discharge, (3) failure to engage in the interactive process, and (4) retaliation. CCCI eventually moved for summary judgment on all of Cooper's claims. Cooper stipulated to the dismissal of his retaliation claim and failed to pursue his failure-to-engage-in-the-interactive-process claim. The district court granted CCCI's motion for summary judgment. This appeal followed.

**II.**

We review a grant of summary judgment de novo. *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 606 (6th Cir. 2019). Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We view the evidence in the light most favorable to the nonmoving party. *Redlin*, 921 F.3d at 606.

**III.**

On appeal, Cooper argues that the district court erred in granting summary judgment to CCCI on his failure-to-accommodate and constructive-discharge claims. We address each claim in turn.

**A.** **Failure to Accommodate**

The ADA prohibits an employer from discriminating against an employee because of the employee's disability. 42 U.S.C. § 12112(a). "Discrimination" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability" unless such an accommodation causes the employer "undue hardship." *Id.* § 12112(b)(5)(A). A "qualified individual" is an employee with a disability who can perform the "essential functions" of his job "with or without reasonable accommodation." *Id.* § 12111(8).

An employee can prove disability discrimination using direct or circumstantial evidence. *Blanchet v. Charter Commc'ns, LLC*, 27 F.4th 1221, 1227 (6th Cir. 2022). That said, a failure-to-accommodate claim necessarily involves direct evidence. *Id.* Thus, we apply our direct-

evidence test to such claims. *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 869 (6th Cir. 2007). Under the direct-evidence test:

> (1) The plaintiff bears the burden of establishing that he or she is disabled. (2) The plaintiff bears the burden of establishing that he or she is "otherwise qualified" for the position despite his or her disability: (a) without accommodation from the employer; (b) with an alleged "essential" job requirement eliminated; or (c) with a proposed reasonable accommodation. (3) The employer will bear the burden of proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon the employer.

*Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 811–12 (6th Cir. 2020) (quoting *Kleiber*, 485 F.3d at 869).

Failure-to-accommodate cases typically fall into two broad categories: (1) cases where the plaintiff does not want an accommodation but instead makes "the straightforward claim" that he can do his job "as it exists"; and (2) "those in which the plaintiff challenges a particular job requirement as unessential or claims that he or she can do the job with reasonable accommodations on the part of the employer." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1182 (6th Cir. 1996), *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312 (6th Cir. 2012). Cooper makes arguments under both categories. First, he argues that he was otherwise qualified for the delivery merchandiser position without an accommodation. If this is true, then CCCI's decision to transfer Cooper to the warehouse because of his disability was discriminatory. Second, and in the alternative, Cooper argues that he was otherwise qualified for the delivery merchandiser position with a reasonable accommodation—placing him on an alternative route such as the Dollywood route or a vacant bulk delivery route.

The parties do not dispute that Cooper's Tourette Syndrome with coprolalia qualifies as a disability.

### 1. Whether Cooper is otherwise qualified without an accommodation

We must answer two questions to determine whether Cooper was otherwise qualified for the delivery merchandiser position without an accommodation. Was excellent customer service

an essential function of Cooper's position at CCCI?  If so, could Cooper perform that function without CCCI changing his job duties in any way?

We answer the first question in the affirmative—excellent customer service is an essential function of Cooper's specific delivery merchandiser position.  As a reminder, not all job functions are essential.  Such functions "may be considered essential because (1) the position exists to perform the function, (2) a limited number of employees are available that can perform it, or (3) it is highly specialized."  *Rorrer v. City of Stow*, 743 F.3d 1025, 1039 (6th Cir. 2014) (citing 29 C.F.R. § 1630.2(n)(2)).  Congress has instructed courts to consider "the employer's judgment" in determining the essential functions of a job.  42 U.S.C. § 12111(8).  A written job description is "evidence of the essential functions of the job."  *Id.*

CCCI identifies "[e]xcellent customer services skills" in its written job description for the delivery merchandiser position as part of the knowledge, skills, and abilities necessary to perform the job.  R. 34-1, PageID 177.  And, crucially, Cooper stipulates that excellent customer service was an essential function of the delivery merchandiser position.  Our analysis of the first question ends there.

We next consider whether Cooper could provide excellent customer service to CCCI's customers without an accommodation.  When the employee claims that he can perform the essential functions of his job without an accommodation and the employer contends that the employee's disability "precludes satisfactory job performance, objective evidence will suffice to establish the fact in question."  *Monette*, 90 F.3d at 1182–83.  But "[t]he ultimate question" remains "whether the evidence presents a sufficient factual disagreement to require submission of the case to the jury, or whether the evidence is so one-sided that the moving part[y] should prevail as a matter of law."  *Payne v. Novartis Pharms. Corp.*, 767 F.3d 526, 530 (6th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)).

A reasonable jury could not find that Cooper could provide excellent customer service to CCCI's customers in his role as a delivery merchandiser without an accommodation.  Of particular importance, Cooper's own doctor noted that Cooper needed an accommodation to perform his job duties.  When a plaintiff's own doctor—not merely the defendant employer—

concludes that the plaintiff cannot perform his job without an accommodation, the plaintiff likely cannot establish that he is otherwise qualified to perform the job without an accommodation. *See Dietelbach v. Ohio Edison Co.*, 1 F. App'x 435, 437 (6th Cir. 2001) (per curiam) (citing *Weigel v. Target Stores*, 122 F.3d 461, 467 (7th Cir. 1997)). Cooper's disability, moreover, caused him to vocalize racist and profane words in the presence of others in the stores of CCCI's customers. At various times during his employment, CCCI's customers complained about the language he used while delivering CCCI's products. In fact, Cooper acknowledges many of the customer complaints made against him in his amended complaint.

CCCI provided Cooper with accommodations in response to the customer complaints. For example, in September 2017, Cooper took medical leave. *See Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 394 (6th Cir. 2017) ("[M]edical leave can constitute a reasonable accommodation under the ADA."). On the form requesting medical leave, Cooper admitted that he had "[a] serious health condition" that makes him "unable to perform the functions" of a delivery merchandiser. And in June 2018, Cooper sought placement in the role of a driver helper as an accommodation so that he would not have to interact with CCCI's customers. Though the burden for demonstrating that one is otherwise qualified for a position is "not an onerous one," *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 855 (6th Cir. 2018), this evidence shows that Cooper could not provide excellent customer service without an accommodation. *See Gearhart v. E. I. du Pont de Nemours & Co.*, 833 F. App'x 416, 423–24 (6th Cir. 2020) (affirming grant of summary judgment where the employee failed to "point to objective evidence" showing he could perform an essential job function without an accommodation).

Cooper makes several arguments in response. First, he argues, relying on his testimony and testimony from some of his former supervisors, that his racist and profane tics were indecipherable. Although the decipherability of purported offensive language is relevant to an analysis of whether Cooper could provide excellent customer service, it is undisputed that on at least two occasions, CCCI's customers understood exactly what Cooper was saying. The parties agree that a Dollar General manager made a complaint against Cooper in September 2017. That manager reported hearing Cooper "frequently and freely" use a racial slur, making the manager "very uncomfortable." R. 34-2, PageID 180; R. 34-3, PageID 183. In February 2018, at a

different Dollar General, the store's manager reported that she was bothered by Cooper's use of racial slurs even after learning about Cooper's condition.

Second, Cooper argues that a factual dispute remains about the number of complaints customers made against him. It is undisputed, however, that Cooper offended CCCI's customers at least twice with his use of racist and profane language, and the ADA does not require an employer to tolerate an employee's repeated inadequate job performance for a certain amount of time before it acts. The specific number of complaints made against Cooper is also immaterial because Cooper contends that his verbal tics using inappropriate language remained consistent throughout his employment.

Third, Cooper argues, relying on *Taylor v. Food World, Inc.*, that a material factual dispute exists regarding whether he could provide excellent service to CCCI's customers without offending them. 133 F.3d 1419 (11th Cir. 1998). *Taylor* does not help Cooper. In *Taylor*, a minor, who had been diagnosed with Asperger's disorder that caused him to engage in echolalia (repetitive speech), worked as a clerk for Food World bagging groceries and taking groceries to customers' vehicles. *Id.* at 1421. Food World terminated the minor after receiving complaints from customers about the minor "speaking loudly and sometimes asking customers personal questions." *Id.* The Eleventh Circuit reversed the district court's grant of summary judgment to Food World, finding there was a factual dispute about whether the questions the minor posed to customers were offensive. *Id.* at 1424. But here, there is no reasonable dispute that Cooper's use of racist and profane language was offensive. *Cf. Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1079 (6th Cir. 1999) (opining that the use of decipherable racial slurs and jokes constituted "offensive conduct"); *Jackson v. Quanex Corp.*, 191 F.3d 647, 662 (6th Cir. 1999) (referring to the use of racial slurs and graffiti as offensive).

This case is more like *Ray v. Kroger Co.*, another Eleventh Circuit case. No. 03-12919, 2003 WL 23018292 (11th Cir. Dec. 17, 2003) (per curiam). In *Ray*, the plaintiff, like Cooper, had been diagnosed with Tourette Syndrome with coprolalia. *Id.* at *1. Ray worked as a grocery clerk for Kroger, which placed him in regular contact with Kroger's customers. *Id.* at *2. The job required Ray to interact with customers without offending them. *Id.* at *4. Ray was unable to do so because he used decipherable racial slurs, which offended some customers. *Id.* at *1, 4.

The Eleventh Circuit found that summary judgment in Kroger's favor was warranted because Ray could not perform an essential function of his job. *Id.* at *4.

It is undisputed that Cooper used racial slurs, those slurs were decipherable to at least some customers, and the decipherable slurs offended customers. Cooper's own doctor also stated that Cooper needed an accommodation to perform his job. Based on these facts, the district court did not err in finding that, as a matter of law, Cooper could not provide excellent customer service without an accommodation.

## 2. Whether Cooper is otherwise qualified with a reasonable accommodation

Cooper contends that CCCI violated the ADA when, instead of providing him with an accommodation that would have allowed him to continue operating as a delivery merchandiser, CCCI transferred Cooper to a warehouse position. For this type of failure-to-accommodate claim, Cooper must show that he "would be qualified to perform the essential functions of the job with [a] reasonable accommodation[.]" *Monette*, 90 F.3d at 1183. Courts and factfinders must consider whether the proposed accommodation is reasonable; whether the accommodation imposes an undue hardship on the employer; and/or whether the plaintiff can perform his job "even with the suggested accommodation." *Id.*

Under the ADA, the employee typically bears "the initial burden of proposing an accommodation and showing that that accommodation is objectively reasonable." *Kleiber*, 485 F.3d at 870 (6th Cir. 2007) (quoting *Hedrick v. W. Rsrv. Care Sys.*, 355 F.3d 444, 457 (6th Cir. 2004)). "Where the requested accommodation is a job transfer, 'employers have a duty to locate suitable positions for' employees with disabilities." *Id.* (quoting *Burns v. Coca-Cola Enters., Inc.*, 222 F.3d 247, 258 (6th Cir. 2000)). Still, "this duty does not require employers 'to create new jobs [or] displace existing employees from their positions . . . to accommodate a disabled individual.'" *Id.* at 869 (quoting *Burns*, 222 F.3d at 257). Nor does a reasonable accommodation require employers to eliminate or reallocate an essential job function. *See Brickers v. Cleveland Bd. of Educ.*, 145 F.3d 846, 850 (6th Cir. 1998). A "reasonable accommodation" under the ADA can include "reassignment to a vacant position." 42 U.S.C. § 12111(9)(B).

Cooper proposed as accommodations a non-customer facing delivery route such as the Dollywood route or a vacant bulk delivery route. Whether Cooper's proposed accommodations were objectively reasonable depends on: (1) whether these or comparable positions were available; and (2) whether Cooper was qualified for the positions. *See Burns*, 222 F.3d at 258 ("[A]lthough employers have a duty to locate suitable positions for disabled employees, such employees may not recover unless they propose . . . particular alternative positions for which they are qualified."). CCCI contends that Cooper's proposed accommodations were not reasonable and, instead, it provided Cooper an accommodation by reassigning him to the warehouse position. We address Cooper's and CCCI's proposed accommodations below.

*Dollywood route*. At some point during Cooper's tenure, CCCI maintained a route for delivery merchandisers to deliver products to the Dollywood resort (the Dollywood route) with no contact with the customer. At summary judgment, CCCI offered the testimony of Richard Youmans—a senior director at CCCI—who testified that in late 2019, before CCCI transferred Cooper to the warehouse, the Dollywood route "became a customer-facing delivery point." R. 34-19, PageID 312–13. Youmans explained that after a leadership change at Dollywood, someone from that organization would follow CCCI's drivers around while they made their deliveries. Also, Dollywood began a "check-in process" to inspect the products that CCCI's drivers delivered throughout the park. *Id*.

In response to this evidence, Cooper points to his own testimony and a declaration by one of his former supervisors, Nathan Roberts. Prior to December 2019, Cooper worked the Dollywood route in some capacity. There was no customer contact when he worked the route. When asked to respond to Youmans's testimony about the change in the route, Cooper testified:

> I'm not going to say he was false . . . to this day they may check-in and process up there, that could be more than correct. But when I was there, there was not a check-in process. You checked yourself in. You signed yourself. You left the ticket with them. You were gone.

R. 42-2, PageID 490. In Roberts's declaration, he stated that the Dollywood route "has almost zero customer interaction and to my knowledge has not materially changed in the past few years." R. 46-1, PageID 568. Roberts further explained that Cooper would have had "no or very little interaction with anyone." *Id.*

Viewing the evidence in Cooper's favor, Cooper has failed to create a triable issue about whether the Dollywood route was a reasonable accommodation. By late 2019, the Dollywood route required customer contact. True, Cooper testified that the Dollywood position had no customer contact when he worked the route. But he does not specify when he worked in that position. For example, if Cooper provided evidence that he worked the Dollywood route during late 2019, a reasonable jury could believe that the position did not become customer-facing prior to Cooper's transfer to the warehouse. He provided no such evidence. Instead, he conceded that the Dollywood position could have changed. And Roberts's declaration does not rebut CCCI's evidence either. Roberts testified that the Dollywood position had *almost* zero customer interaction, not that it had *no* customer interaction. Because Cooper failed to provide evidence that the Dollywood route was not customer-facing during the relevant time period, he failed to demonstrate that the Dollywood route was an objectively reasonable accommodation that would allow him to perform the essential functions of the job.

*Bulk delivery route*. Cooper also proposed working the bulk delivery route as an accommodation. But he admitted that there was no bulk delivery position open in December 2019. Because the position was not vacant, it was not a reasonable accommodation as a matter of law. *See* 42 U.S.C. § 12111(9)(B).

*Warehouse position*. CCCI provided Cooper with an accommodation by reassigning him to a warehouse position, which Cooper characterized as a "demotion" to a "far less desirable" position. D. 12 at pp.42–43. However, "[a]n employer may reassign an employee to a lower grade and paid position if the employee cannot be accommodated in the current position and a comparable position is not available." *Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 634 (6th Cir. 1998). And as we explained above, Cooper could not perform the delivery merchandiser position without an accommodation, and he failed to propose an objectively reasonable accommodation. Thus, CCCI's accommodation, via transfer to a warehouse position, was reasonable.

B.      **Constructive Discharge**

Cooper argues that CCCI constructively discharged him when CCCI transferred Cooper to the warehouse position. "A constructive discharge occurs when 'working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" *Tchankpa*, 951 F.3d at 814 (quoting *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1107 (6th Cir. 2008)). To establish a claim for constructive discharge, a plaintiff must prove: (1) the employer deliberately created working conditions that a reasonable person would perceive as intolerable, (2) the employer did so to force the employee to quit, and (3) the employee quit. *Savage v. Gee*, 665 F.3d 732, 739 (6th Cir. 2012). Constructive-discharge claims require courts to examine "both the employer's intent and the employee's objective feelings." *Id.* (quoting *Moore*, 171 F.3d at 1080). Cooper's claim fails at the second element—he cannot show that CCCI deliberately created intolerable working conditions with the intention of forcing him to quit.

Each time Cooper requested an accommodation from CCCI, the company provided one. For example, after the incident at the Dollar General store in early 2018, CCCI adjusted Cooper's route so that he would not have to service Dollar General stores. And after Cooper submitted a request to be put on a truck with another driver in August 2018, CCCI temporarily allowed him to work as a driver helper. Although "a complete failure to accommodate, in the face of repeated requests, might suffice as evidence to show the deliberateness necessary for constructive discharge," *Talley*, 542 F.3d at 1109 (citation omitted), that is not the case here.

In fact, Cooper admits CCCI provided him with the warehouse position as an accommodation. Of course, he preferred a different accommodation. But the evidence demonstrates that CCCI offered Cooper a vacant position that was as close as CCCI could get to his delivery merchandiser job. What is more, Cooper admitted that when he resigned, he told his supervisor that he held nothing against CCCI.

Cooper has failed to create a triable issue on his constructive-discharge claim. He has offered no evidence that CCCI placed him in the warehouse position to force his resignation rather than as an accommodation.

## IV.

For the reasons above, we **AFFIRM** the district court's judgment.