NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0563n.06

Case No. 25-3126

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

Dec 08, 2025

KELLY L. STEPHENS, Clerk

RICHARD FOWLKES,

 Plaintiff - Appellant,

v.

UNITED STATES DEPARTMENT OF
DEFENSE,

 Defendant - Appellee.

)
)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE SOUTHERN
DISTRICT OF OHIO

O P I N I O N

Before: McKEAGUE, GRIFFIN, and MATHIS, Circuit Judges.

**McKEAGUE, Circuit Judge.** Richard Fowlkes sued the United States Department of Defense claiming he was terminated from his job with the United States Air Force due to his disability. The district court granted summary judgment to the Department of Defense after determining that Fowlkes could not establish a prima facie case for disability-based discrimination. We agree with the district court and **AFFIRM**.

**I. BACKGROUND**

Fowlkes began working as an Electronics Engineer with the Air Force's F-15 Qatar Team on October 1, 2018, positioned at Wright Patterson Air Force Base. He was responsible for technical projects that supported foreign sales, often working with contractors that manufactured military equipment. As was the case for many civilian hires into the Air Force, Fowlkes was hired on a conditional basis; his first two years on the job were probationary, an extension of the hiring

process that allowed his supervisors to continue evaluating his conduct, performance, and character. Despite his objective qualifications—advanced degrees in engineering and a previous deployment with the Air Force—Fowlkes was terminated in September 2019, only eleven months after starting his job. Fowlkes claims he was terminated due to his disabilities.

Fowlkes suffers from post-traumatic stress disorder ("PTSD") and major depressive disorder. Early in his tenure, he informed his first-level supervisor, Donald Huckle, of his conditions and asked for accommodations that would allow him to attend medical appointments during typical work hours. Fowlkes also wanted certain supervisors to be aware of his conditions so they could understand his potential struggles. In Fowlkes's mind, this meant sympathizing with some of his reactions triggered by PTSD. For example, sudden noises could "cause a dive for cover type of reflex." Fowlkes Dep., R.33-1 at PageID 828-29. Notably, Fowlkes did not think he had a problem with conflict de-escalation, and he later rejected a proposed accommodation from supervisors aimed at helping him avoid adversarial encounters due to his PTSD-triggered anger.

Without going through any formal process, Huckle agreed to accommodate Fowlkes's requests. According to Fowlkes, his informal accommodations were "working wonders"; his team understood his PTSD and tried to help him succeed. Fowlkes Dep., R.33-1 at PageID 776. However, a series of incidents defined Fowlkes's tenure. Beyond the technical expertise required to succeed as an Electronics Engineer, the position demanded effective and respectful communication with colleagues and contractors. The record shows that Fowlkes struggled with this essential function of the job.

### A. Technical Evaluations

As one of Fowlkes's initial assignments, he was directed to complete a series of technical evaluations that would analyze proposals from a government contractor. At times, Fowlkes would need to ask the contractor clarifying questions. According to Stephanie NeCamp,[1] the lead flight

---

[1] NeCamp has since changed her name to Stephanie Lohm, but for consistency and clarity, the opinion will refer to her as NeCamp, which is the name she held at the time she interacted with Fowlkes.

systems engineer for the F-15 Qatar team who supervised Fowlkes for this project, Fowlkes could not be trusted with this element of the assignment. Colleagues would need to screen his questions to the contractor because they were "a little too inflammatory." *See* NeCamp Dep., R.42-1 at PageID 1195-96.

NeCamp was also concerned about Fowlkes's internal communications with the Qatar team. Fowlkes would push back on NeCamp's directions, circumvent her in the chain of command in hopes of overruling her management initiatives, and speak passive-aggressively to other team members. Despite admitting that he would ignore the chain of command to complain about NeCamp's orders, Fowlkes saw things differently, calling NeCamp a "lady manipulator" who unfairly targeted him. Fowlkes acknowledged that he did not get along with NeCamp, but he did not think he had any other interpersonal issues in the workplace.

### B. Specific Interactions with Others

Contrary to his personal assessment, Fowlkes's supervisors claimed that his communications with others—both colleagues and contractors—were a constant issue. At his Mid-Point Review Assessment (which consisted of a one-on-one meeting followed by a written summary documenting the feedback Fowlkes received), Huckle advised Fowlkes that he needed to "minimize the adversarial nature of [his] interactions." 2019 Mid-Point Rev., R.47-2 at PageID 1661-62. In this type of evaluation, any negative feedback was considered significant, and for Fowlkes, the crux of his review focused on the unacceptable nature of his communications.

These adversarial interactions were a regular occurrence throughout Fowlkes's time as an Air Force engineer. Much like his experience under NeCamp's supervision, Fowlkes's other supervisors also struggled with his attempts to circumvent chains of command, question authority, and speak in inflammatory tones. But beyond Fowlkes's typical demeanor in the office—which presented frequent challenges—two specific incidents stood out to his supervisors as particularly indicative of Fowlkes's inability to effectively perform the communication functions of the

engineering job. One incident involved a phone conversation with Boeing, a primary contractor for the Qatar group. The other involved a conversation with colleagues.

**1. Conversation with Boeing**

This episode was known as "the May 6th incident." *E.g.*, NeCamp Dep., R.42-2 at PageID 1321-22. Seven months into his tenure, on May 6, 2019, Fowlkes and one of his Air Force colleagues—Julio Vega-Flores—were on a conference call with representatives from Boeing. After settling into the call, a Boeing representative made a comment that Vega-Flores characterized as unprofessional yet common for multi-billion-dollar deals; the comment seemed to question Fowlkes's reliability. In response, Fowlkes erupted. Fowlkes started yelling at the Boeing representative in a manner that could be heard across the office, even by those wearing noise-canceling headphones. Fowlkes testified that during this incident he was "trembling like a leaf," and—in Fowlkes's own words—his anger went "from zero to 100 in a second," as if he was "Bruce Banner transforming into the Incredible Hulk." Fowlkes Dep., R.33-1 at PageID 841, 852; Fowlkes Aff., R.47-1 at PageID 1586-87. Vega-Flores, who tried to intervene until Fowlkes stopped him from doing so, had never seen a government employee act with such anger in a workplace setting before, despite participating in similar conversations throughout his career. Surrounding colleagues were concerned and nervous, alarmed by Fowlkes's conduct. Fowlkes attributed his outburst to his PTSD.

Tobin Denney—Fowlkes's second-level supervisor—had to apologize to the Boeing representative following this incident and communicate that Fowlkes was not a proper representation of the Qatar team. Denney, along with NeCamp, also held a counseling session with Fowlkes to discuss what happened on the call. Denney and NeCamp tried to provide advice and suggestions to help him avoid stressful interactions with contractors in the future, and they offered an accommodation: another individual could attend Fowlkes's calls to help de-escalate potentially adversarial communications. But Fowlkes refused, claiming he was "an adult" who did not need

this assistance. Denny Decl., R.47-2 at PageID 1739; NeCamp Dep., 42-2 at PageID 1329; Fowlkes Aff., R.47-1 at PageID 1587. Nonetheless, Fowlkes recognized that his interactions with Boeing were an issue. He testified that he "was pissing off Boeing really bad." Fowlkes Dep., R.33-1 at PageID 856. And he understood that "engineers need to communicate with each other professionally." *Id.* at PageID 855.

## 2. Conversation with Colleagues

A couple months later, on August 2, 2019, Fowlkes had another outburst. Fowlkes was talking with some of his Air Force colleagues on the contracting team about his work with Boeing, noting that he was "pissed off" from his efforts to get information from the company's representatives. Fowlkes was unable to manage his escalating anger. He became increasingly agitated as he talked about his experiences with Boeing, raising his voice with his colleagues who were trying to listen and provide solutions. When one of Fowlkes's coworkers tried to defuse the situation, Fowlkes did not stop. Fowlkes continued to raise his voice at the contracting team until Todd Kocher, a contracting officer, overheard Fowlkes's yelling and intervened, directing Fowlkes to leave the office so he could cool off. Fowlkes was to return when he could control his emotions. Once again, surrounding colleagues raised concerns to supervisors, commenting on Fowlkes's unpredictability and instability.

## C. Termination

After "the May 6th incident" on the call with Boeing, Fowlkes's supervisors recognized that the human resources team should be apprised of Fowlkes's conduct. And after the incident on August 2nd, when Fowlkes was asked to leave the office due to his anger, his supervisors decided to begin the termination process, concluding his behavior was getting worse. Denney's description of Fowlkes's tenure was indicative of the struggles:

> I have never been confronted with an employee that created the level of disruption both to our internal employees and our industry contractor counterparts. I was routinely informed by his supervisor, other supervisors[,] and general coworkers

> that his behavior and job performance were disruptive, problematic[,] and concerning. In addition, it is the first time that I have ever had a contractor call me to raise a concern about their interactions with an employee. The engineering leads on the program discussed job performance with [Fowlkes], however, changes were not forthcoming.

Denney Decl., R.47-2 at PageID 1742.

Fowlkes's supervisors gathered a long list of incidents in which Fowlkes's behavior was adversarial, argumentative, and detrimental to send to the human resources department. The list included Fowlkes's outbursts, graphic comments he made at all-hands staff meetings, examples of everyday interactions that made colleagues uncomfortable, and complaints from supervisors and contractors. It also noted that Fowlkes rejected assistance from his colleagues and supervisors. When others would try to help him de-escalate phone calls, or propose potential accommodations that could minimize the adversarial nature of his interactions, Fowlkes would refuse. Collectively, his superiors, along with the human resources department, decided that termination was the proper course of action. Citing some, but not all, of Fowlkes's documented incidents, the termination letter stated that during this probationary period, Fowlkes had not demonstrated that he could capably perform the engineering job due to his inability to properly communicate.

Fowlkes filed this lawsuit against the Department of Defense claiming disability-based discrimination and whistleblower-based retaliation. After voluntarily dismissing his retaliation claim, the district court granted summary judgment in favor of the Department of Defense on his discrimination claim. Fowlkes timely appealed.

## II. STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Saunders v. Ford Motor Co.*, 879 F.3d 742, 748 (6th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The movant bears the initial burden of demonstrating that summary judgment is warranted. *Celotex Corp. v. Catrett*, 477 U.S.

317, 323 (1986). If met, the burden then shifts to the nonmovant, who must cite specific evidence indicating that a genuine dispute of material fact exists. *Id.* at 324; *see also* Fed. R. Civ. P. 56(c)(1), (e). We view the facts and draw inferences in favor of the nonmovant, *Taylor v. City of Saginaw*, 11 F.4th 483, 486-87 (6th Cir. 2021), but the nonmovant must provide more than a mere "'scintilla' of evidence to support its claims," *Walden v. Gen. Elec. Int'l, Inc.*, 119 F.4th 1049, 1056 (6th Cir. 2024) (quoting *Anderson*, 477 U.S. at 252). We review the district court's legal conclusions de novo and its factual findings for clear error. *Energy Mich., Inc. v. Mich. Pub. Serv. Comm'n*, 126 F.4th 476, 485 (6th Cir. 2025).

### III. ANALYSIS

Fowlkes claims that the Air Force terminated him due to his mental-health disabilities and therefore discriminated against him based on his PTSD. "The Rehabilitation Act . . . constitutes the exclusive remedy for a federal employee alleging disability-based discrimination." *Jones v. Potter*, 488 F.3d 397, 403 (6th Cir. 2007). To determine whether a federal employee has been subjected to a Rehabilitation Act violation, courts apply the same standards as if analyzing a claim under the Americans with Disabilities Act ("ADA"). *Patterson v. Kent State Univ.*, 155 F.4th 635, 651 (6th Cir. 2025) (citing 29 U.S.C. § 794(d)); *see also Brent-Crumbley v. Brennan*, 799 F. App'x 342, 344-45 (6th Cir. 2020) (per curiam).

The parties agree that Fowlkes bases his disability-based discrimination claim on indirect evidence, thus "the *McDonnell Douglas* burden-shifting framework governs." *Bledsoe v. Tenn. Valley Auth. Bd. of Dirs.*, 42 F.4th 568, 581 (6th Cir. 2022). Fowlkes must first establish a prima facie case by showing (1) "that he is disabled"; (2) "that he is otherwise qualified for the job, with or without reasonable accommodation"; (3) "that he suffered an adverse employment action"; (4) "that his employer knew or had reason to know of his disability"; and (5) "that, following the adverse employment action, either he was replaced by a nondisabled person or his position remained open." *Id.* at 578 (quoting *Jones*, 488 F.3d at 404). If he establishes a prima facie case,

the Department of Defense must then "offer a nondiscriminatory reason for the adverse action." *Id.* at 581. The burden would then shift back to Fowlkes to "demonstrate that the employer's reason is a pretext for discrimination." *Id.*

Fowlkes does not make it past the prima facie stage of the analysis because he cannot show that he was "otherwise qualified for [his] job, with or without reasonable accommodation." *See id.* at 578. "According to our circuit's precedent, satisfying this element is itself a three-part inquiry." *Kellar v. Yunion, Inc.*, 157 F.4th 855, 877 (6th Cir. 2025). "First, 'the employee typically bears the initial burden of proposing an accommodation and showing that the accommodation is objectively reasonable.'" *Id.* (cleaned up) (quoting *Cooper v. Dolgencorp, LLC*, 93 F.4th 360, 371 (6th Cir. 2024)). Then, the employee must "demonstrate that with this proposed accommodation, he could perform the essential functions of the job." *Id.* (citing *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 202 (6th Cir. 2010)). At that point, the burden shifts, and the employer would need to demonstrate that the proposed accommodation "'would impose an undue hardship' on its operations," otherwise the employee would be considered a "qualified individual." *See id.* (citing 42 U.S.C. § 12112(b)(5)(A) and *King v. Steward Trumbull Mem'l Hosp., Inc.*, 30 F.4th 551, 568 (6th Cir. 2022)); *see also Cooper*, 93 F.4th at 371. Here, Fowlkes fails at the second step.

## A. Proposing a Reasonable Accommodation

Accommodations ensure that an employee can perform a job "despite any limitations imposed by the disability." *Kellar*, 157 F.4th at 877 (citing *Jakubowski*, 627 F.3d at 202). An accommodation is reasonable "if it represents an 'appropriate adjustment or modification of policies'" in the workplace. *Id.* (cleaned up) (quoting 42 U.S.C. § 12111(9)).

Early in his tenure, Fowlkes approached Huckle to propose an accommodation. He sought scheduling flexibility that would allow him to attend his doctor appointments. Fowlkes also asked for his supervisors to recognize that he had PTSD and help him "be successful with it." Fowlkes Dep., R.33-1 at PageID 776. While this was a vague request, Fowlkes clearly did not understand

this proposed accommodation to include any formal counseling or personal assistance with anger-based PTSD symptoms, as Fowlkes rejected supervisors' attempts to provide additional, individualized support to minimize adversarial encounters and help him de-escalate confrontations.

In this context, Fowlkes's requests were reasonable. Even though Huckle did not fill out the paperwork to establish a formal accommodation, he considered Fowlkes's request for scheduling flexibility the kind of accommodation he would be willing to provide to all employees. Similarly, with an open-door policy, Huckle made himself available to his whole team; Fowlkes could talk through any issues that were pressing, including his struggles with PTSD. Fowlkes requested accommodations that were essentially existing policies. Thus, his requests were reasonable.

## B. Performing the Essential Functions of the Job

Because Fowlkes requested reasonable accommodations, "[t]he question becomes: could [Fowlkes] perform the essential functions of the job" with scheduling flexibility for his doctor appointments and a general understanding from his coworkers about his mental health disabilities? *See Kellar*, 157 F.4th at 877. The record shows that he could not.

"Whether a job function is essential is a question of fact that is *typically* not suitable for resolution on a motion for summary judgment." *Thompson v. Fresh Prods., LLC*, 985 F.3d 509, 525 (6th Cir. 2021) (emphasis added) (quoting *Rorrer v. City of Stow*, 743 F.3d 1025, 1039 (6th Cir. 2014)). "In attempting the analysis, courts consider 'the employer's judgment,' 'written job descriptions prepared before advertising or interviewing applicants for the job,' 'the amount of time spent on the job performing the function,' and 'the consequences of not requiring the incumbent to perform the function.'" *Kellar*, 157 F.4th at 877-78 (cleaned up) (quoting 29 C.F.R. § 1630.2(n)(3)). At its core, "[e]ssential functions are 'the fundamental job duties of the employment position the individual with a disability holds or desires.'" *Rorrer*, 743 F.3d at 1039

(quoting 29 C.F.R. § 1630.2(n)(1)). If "the position exists to perform the function," then the function may be considered essential. *Id.* (citing 29 C.F.R. § 1630.2(n)(2)).

Communication—with both his Air Force colleagues and contractors—was an essential function of Fowlkes's engineering job. As outlined in the job description, the Electronics Engineer was required to "[e]ffectively communicate[]" in "interactions with customers, coworkers, and groups." Job Description, R.47-2 at PageID 1652. Communications needed to be "clear, concise, and at the appropriate level," and the Electronics Engineer was expected to "[p]romote[] and maintain[] [an] environment of cooperation and teamwork." *Id.* A fundamental aspect of his main assignment was communicating with contractors; his job existed to liaise between the Air Force and Boeing. Fowlkes does not contest this notion; he testified that an important part of the engineering job was "communicat[ing] with each other professionally" to "solve the problems" he was assigned to tackle. Fowlkes Dep., R.33-1 at PageID 855.

But even with his accommodations, Fowlkes was unable to perform the essential communication functions of his job. His emotional outbursts—the likes of which Air Force employees had not seen before in the office setting—fractured relationships with Air Force contractors; Fowlkes's supervisors had to apologize to Boeing representatives due to his behavior, and other employees had to screen his questions to contractors because they were too inflammatory. The Electronics Engineer was supposed to build rapport and collaborate with contractors, but Fowlkes quickly became an obstacle his supervisors and colleagues were forced to overcome.

Fowlkes's internal communications were also unacceptable. Fowlkes was disrespectful to his colleagues and was unable to follow the chain of command. Even after Fowlkes was informed at his Mid-Point Review Assessment that his interactions with colleagues were too adversarial and needed improvement, Fowlkes was unable to change his behavior. In fact, according to his supervisors, Fowlkes's conduct got worse. Fowlkes's outbursts were so inhibiting that he would be asked to leave the office; it interfered with his ability to perform his job.

Fowlkes's requested accommodations—scheduling flexibility for doctor appointments and general understanding of his PTSD—did not help him perform the essential communication functions of his job. And, notably, Fowlkes rejected additional accommodations that may have proved beneficial. When Denney and NeCamp offered to arrange for a colleague to sit in on Fowlkes's calls to help de-escalate adversarial encounters, Fowlkes refused. We need not consider whether Fowlkes could perform the essential functions of the job with accommodations that he rejected.

Rather than meaningfully dispute his documented struggles with workplace communication,[2] Fowlkes argues that in this analysis, courts should only consider objective qualifications, like his degrees and experience. In support of this proposition, Fowlkes cites *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564 (6th Cir. 2003) (en banc), and *Morgan v. Interstate Resources, Inc.*, No. 23-3866, 2024 WL 3221394 (6th Cir. June 28, 2024). While these cases instruct courts to focus on objective qualifications when an employer terminates an employee for purported poor performance, *e.g.*, *Wexler*, 317 F.3d at 575-76, these cases only involve age-based discrimination. Disability-based discrimination claims warrant a different analysis because under the Rehabilitation Act (borrowing the standard from the ADA) courts must first determine whether the employee is a "qualified individual," someone "who, with or without reasonable accommodation, can perform the essential functions of the job." *See* 29 U.S.C. § 794(d) (stating that the standards from 42 U.S.C. § 12111 apply to Rehabilitation Act claims); 42 U.S.C. § 12111(8) (defining "[q]ualified individual"); *see also Patterson*, 155 F.4th at 651. Thus, we are not limited to Fowlkes's objective qualifications; we must also look to whether he could perform

---

[2] Fowlkes baselessly claims his supervisors exaggerated the reports of his outbursts. He does not present evidence that supports this assertion, and he does not challenge the evidence that corroborates the disruptive nature of his adversarial communications.

the essential functions of his job. That analysis includes whether he could sufficiently communicate.[3]

Fowlkes's case is much like *Jakubowski*. In *Jakubowski*, we determined that a doctor was unable to perform the essential communication-based functions of his job, even with his proposed accommodation: "knowledge and understanding" from "the hospital physicians and staff" about the "triggers" that hindered his ability to communicate. 627 F.3d at 202. Even with his requested accommodation, the doctor was still unable to properly communicate with patients. His colleagues and supervisors had to monitor his internal communications and correct his errors. *Id.* at 198. And he was unable to sufficiently convey treatment plans to patients. *Id.* at 202. His accommodation did "not address a key obstacle preventing him from performing a necessary function" of a medical provider, so he did not establish a prima facie case. *Id.*

Here, Fowlkes sought a similar accommodation: understanding from his colleagues about his PTSD. But that did not help him communicate in the manner the job required, and he rejected additional support. Fowlkes's colleagues had to monitor and correct his communications with Boeing contractors, and Fowlkes was unable to communicate with contractors and coworkers in an appropriate manner, which hindered Fowlkes's ability to liaise with contractors and solve problems as an engineer. Fowlkes did not meet his burden of showing that he could perform the essential communication functions of the engineering job with his proposed accommodations. Thus, he did not establish a prima facie case for disability-based discrimination, and we need not address the other potential shortcomings of Fowlkes's claim.

---

[3] Fowlkes also argues that the district court improperly considered the Air Force's proffered nondiscriminatory reason for terminating him at the prima facie stage. Not so. The district court did not discuss his inability to sufficiently communicate because it was the purported nondiscriminatory motivation for Fowlkes's termination. Nor do we. Looking at the record, Fowlkes's inability to communicate makes it clear that he is not a "qualified individual." The overlap does not insulate Fowlkes from this fatal flaw in his prima facie case. Regardless of the Air Force's proffered reason, Fowlkes must establish his prima facie case; here, that includes showing that he could perform the essential communication functions of the job with a reasonable accommodation. Evaluating the Air Force's proffered reason for Fowlkes's termination is a separate analysis that we do not reach in this case.

## IV. CONCLUSION

For these reasons, we **AFFIRM** the district court's judgment.